RENDERED: NOVEMBER 12, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0313-OA

HONORABLE ANDREW BESHEAR, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY; ERIC FRIEDLANDER, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE KENTUCKY CABINET FOR HEALTH AND FAMILY SERVICES; DR. STEVEN STACK, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE KENTUCKY DEPARTMENT FOR PUBLIC HEALTH; THE KENTUCKY CABINET FOR HEALTH AND FAMILY SERVICES; AND THE KENTUCKY DEPARTMENT FOR PUBLIC HEALTH

PETITIONERS

v.

ORIGINAL ACTION IN THE SUPREME COURT
ARISING FROM THE COURT OF APPEALS
CASE NO. 2020-CA-0834
BOONE CIRCUIT COURT CASE NO. 20-CI-00678

HONORABLE GLENN E. ACREE, JUDGE, KENTUCKY COURT OF APPEALS; AND HONORABLE RICHARD A. BRUEGGEMANN, JUDGE, 52ND JUDICIAL CIRCUIT, BOONE CIRCUIT COURT

RESPONDENTS

AND

FLORENCE SPEEDWAY, INC.; RIDGEWAY PROPERTIES, LLC, D/B/A BEANS CAFE & BAKERY; LITTLE LINKS LEARNING, LLC; AND HONORABLE DANIEL J. CAMERON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL

REAL PARTIES IN INTEREST

**OPINION OF THE COURT BY JUSTICE HUGHES**

**REVERSING**

**INTRODUCTION**

On March 6, 2020, as the COVID-19 global pandemic reached Kentucky, Governor Andy Beshear declared a state of emergency pursuant to Executive Order 2020-215. In the ensuing days and weeks, he issued additional executive orders and emergency regulations to address the public health and safety issues created by this highly contagious disease. In late June, three Northern Kentucky business owners filed suit in the Boone Circuit Court challenging various orders affecting the reopening of their respective businesses as well as the Governor's authority generally in emergencies. Attorney General Daniel Cameron intervened as a plaintiff, and the parties proceeded to obtain a restraining order that prohibited enforcement of certain of the emergency orders.

In response to that action with its imminent injunction hearing and at least one similar case elsewhere in the Commonwealth, this Court entered an order on July 17, 2020, staying all injunctive orders directed at the Governor's COVID-19 response until those orders were properly before this Court, with full record, pursuant to the direction of the Court. Having received briefs and heard oral argument, this Court addresses five primary questions. We begin by summarizing our answers to those questions.

**I. Did the Governor Properly Declare a State of Emergency and Validly Invoke the Emergency Powers Granted to Him in Kentucky Revised Statute (KRS) Chapter 39A?**

Yes. KRS 39A.100 authorizes the Governor to declare a state of emergency in the event of the occurrence of any of the situations or events contemplated by KRS 39A.010, which includes biological and etiological hazards such as the COVID-19 pandemic. Although the governing statutes do not require resort to the definition of "emergency" in KRS 39A.020(12), if that definition were applicable it would not inhibit the Governor's authority. The local emergency management agencies referenced in KRS 39A.020(12) "shall, for all purposes, be under the direction . . . of the Governor when [he] deems that action necessary." KRS 39B.010(5). Thus, the Governor was authorized to act without deference to any determination by a local authority or emergency management agency. On March 30, 2020, the General Assembly acknowledged the state of emergency declared by the Governor and "the efforts of the Executive Branch to address . . . the outbreak of COVID-19 virus, a public health emergency." 2020 S.B. 150.

**II. Is KRS Chapter 39A With Its Provisions Regarding the Governor's Powers in the Event of an Emergency an Unconstitutional Delegation of Legislative Authority in Violation of the Separation of Powers Provisions of Sections 27 and 28 of the Kentucky Constitution?**

No. The Kentucky Constitution does not directly address the exercise of authority in the event of an emergency except as to those events requiring the military, the Governor being the "commander-in-chief of the army and navy of this Commonwealth and of the militia thereof." Ky. Const. § 75. However, our Constitution, which provides for a part-time legislature incapable of convening

3

itself, tilts toward emergency powers in the executive branch. Section 80 provides the Governor "**may**, on extraordinary occasions, convene the General Assembly" and may do so at a different place if Frankfort has "become dangerous from an enemy or from contagious diseases." (Emphasis added.) The language is permissive, not mandatory. So emergency powers appear to reside primarily in the Governor in the first instance, but to the extent they are perceived as legislative, KRS Chapter 39A is a lawful delegation of that power with sufficient standards and procedural safeguards to pass constitutional muster. Kentucky has recognized the lawful delegation of legislative powers for decades, and we decline to overrule that precedent, especially in circumstances that would leave the Commonwealth without day-to-day leadership in the face of a pandemic affecting all parts of the state. Notably, the General Assembly, in 2020 Senate Bill 150, recognized the Governor's use of the KRS Chapter 39A emergency powers, directed him to declare in writing when the COVID-19 emergency "has ceased" and further provided: "In the event no such declaration is made by the Governor on or before the first day of the next regular session . . . the General Assembly may make the determination."

### III. Was the Governor Required to Address the COVID-19 Emergency Solely Through Emergency Regulations Adopted Pursuant to KRS Chapter 13A?

No. The General Assembly has specifically authorized the Governor in KRS 39A.090, .100 and .180 to act through executive orders and regulations that supersede "[a]ll existing laws, ordinances, and administrative regulations." KRS 39A.180(2). KRS Chapter 13A is not controlling in the event of a declared

4

emergency pursuant to KRS 39A.010(1).  In any event, the procedural safeguard of public notice is satisfied because KRS 39A.180 mandates that all emergency orders and administrative regulations issued by the Governor or any state agency "shall have the full force of law" when "a copy is filed with the Legislative Research Commission," just as occurs under KRS Chapter 13A.

## IV. Do the Challenged Orders or Regulations Violate Sections 1 or 2 of the Kentucky Constitution Because They Represent the Exercise of "Absolute and Arbitrary Power Over the Lives, Liberty and Property" of Kentuckians?

Only one subpart of one order, no longer in effect, was violative of Section 2.  Property rights are enumerated in the Kentucky Constitution and are entitled to great respect, but they are not fundamental rights in the sense that all governmental impingements on them are subject to strict scrutiny, particularly in the area of public health.  As with all branches of government, the Governor is most definitely subject to constitutional constraints even when acting to address a declared emergency.  In this case, however, the challenged orders and regulations have not been established to be arbitrary, i.e., lacking a rational basis, except for one subpart of one order regarding social distancing at entertainment venues that initially made no exception for families or individuals living in the same household.  Executive orders in emergency circumstances, especially where public health and safety is threatened, are entitled to considerable deference by the judiciary.  During the course of this litigation, several of the orders and regulations at issue were superseded or changed, rendering some of the challenges moot.

**V. Did the Boone Circuit Court Properly Issue Injunctive Relief Prohibiting Enforcement of the Governor's Orders or Regulations?**

No.  Injunctive relief requires that a plaintiff prove irreparable injury, establish that the equities favor issuance of the injunction and raise a substantial question on the underlying merits, defined as a substantial possibility that the plaintiff will ultimately prevail.  Given our conclusion regarding the lawful manner in which the Governor has responded to the COVID-19 emergency, Plaintiffs have not raised a substantial question on the merits with respect to their insistence that the Governor must first contact and defer to local emergency response agencies pursuant to KRS 39A.020(12); their separation of powers argument; their claim that KRS Chapter 13A controls issuance of all executive orders and regulations; or their argument that the Governor has exercised arbitrary powers in violation of Sections 1 and 2 of the Kentucky Constitution.  Even if some Plaintiffs arguably have established irreparable harm to their businesses, that alone is insufficient to justify an injunction precluding enforcement of emergency orders and regulations directed to the protection of the health and safety of **all** Kentuckians.  Applying our time-honored injunction standard, the law and equities favor the Governor in this matter.

Before turning to the facts of this case, we note that if Plaintiffs and the Attorney General were successful on any one of the first three issues of law– proper invocation of emergency powers, separation of powers among the three branches of government or applicability of KRS Chapter 13A–it would be the proverbial "knock-out punch" because it would undermine all of the Governor's

6

COVID-19 response.[1]  Because the law does not support them on those issues, their remaining argument that the Governor has acted arbitrarily in violation of Sections 1 and 2 of the Kentucky Constitution requires consideration of certain challenged individual executive orders and regulations.  We do that below.  Before proceeding further, we first note that this case has been heralded as the "face mask" case, but as Plaintiffs' counsel acknowledged at oral argument, that is not entirely accurate.  Very little proof was elicited in the Boone Circuit Court regarding face masks and the proposed final injunction order makes no specific findings as to face masks other than the Plaintiffs' asserted willingness to require employees and customers to wear them and a passing reference to a study comparing cloth masks to medical masks.  In the end, the only face mask issue presented to this Court is whether the penalty provisions in the emergency regulation are enforceable.  Second, although reference is made in briefs and the Boone Circuit Court order to earlier restraints on religious activities and elective medical procedures, neither of those issues is before us in this case.  The religious challenges have been litigated in federal court, and no religious organization or health care provider has appeared in this case to challenge the Governor's COVID-19 response.[2]  With those clarifications, we turn to what is before this Court.

---

[1] The actual declaration of emergency would only be undermined if the first or second argument was successful.

[2] Public perception that restrictions on nursing home or hospital visitation are at issue in this case is also in error because those restrictions are not before us and in any event stem from a combination of state and federal directives.  *See, e.g.*, Cabinet for Health and Family Services, *Provider Guidance Update: Phased Reduction of Restrictions for Long Term Care Facilities* (Oct. 7, 2020), https://chfs.ky.gov/cv19/

## FACTS AND PROCEDURAL HISTORY

COVID-19 is a respiratory disease caused by a virus that transmits easily from person-to-person and can result in serious illness or death. According to the Centers for Disease Control and Prevention (CDC), the virus is primarily spread through respiratory droplets from infected individuals coughing, sneezing, or talking while in close proximity (within six feet) to other people.[3] On January 31, 2020, the United States Department of Health and Human Services declared a national public health emergency, effective January 27, 2020, based on the rising number of confirmed COVID-19 cases in the United States.[4] The CDC identified the potential public health threat posed by COVID-19 nationally and world-wide as "high."[5]

---

LTCFGuidancePhasedRestoration.pdf; Centers for Disease Control and Prevention (CDC), *Healthcare Facility Guidance*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-hcf.html (last updated June 28, 2020); and Centers for Medicare & Medicaid Services, *Nursing Home Reopening Recommendations for State and Local Officials*, https://www.cms.gov/files/document/qso-20-30-nh.pdf-0 (last updated Sept. 28, 2020).

[3] In addition, a person possibly can contract COVID-19 by touching a surface or object that has the virus on it and then touching their own nose, mouth or eyes. CDC, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last updated Sept. 21, 2020).

[4] U.S. Department of Health and Human Services, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.

[5] *See* Anne Schuchat, *Public Health Response to the Initiation and Spread of Pandemic COVID-19 in the United States, February 24-April 21, 2020* (May 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6918e2-H.pdf; CDC, *Global COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/global-covid-19/ (last updated Nov. 5, 2020). *See also* World Health Org., *Novel Coronavirus (2019-nCoV): Situation Report-13* (Feb. 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200202-sitrep-13-ncov-v3.pdf.

On March 6, 2020, Governor Andy Beshear, under the authority vested in him pursuant to KRS Chapter 39A, declared a state of emergency in Kentucky. Executive Order 2020-215. Subsequently, all 120 counties in Kentucky declared a state of emergency.[6] After the statewide declaration, Kentucky's Cabinet for Health and Family Services (the Cabinet) began issuing orders designed to reduce and slow the spread of COVID-19 and thereby promote public health and safety. Those orders included directives such as prohibiting on-site consumption of food and drink at restaurants, closing businesses that encourage congregation, and prohibiting mass gatherings. As knowledge regarding the heretofore unknown novel coronavirus (COVID-19) grew, the Governor and the Cabinet modified their orders accordingly.[7]

On March 17, 2020, the Cabinet issued an order requiring all public-facing businesses that encourage public congregation to close, including gyms, entertainment and recreational facilities, and theaters.[8] These emergency measures worked to reduce COVID-19 cases by limiting gatherings where the virus could be transmitted. The Governor announced on April 21, 2020, the

---

[6] Kentucky Association of Counties, *COVID-19 County Emergency Declarations* (Mar. 23, 2020), https://covid-19.kaco.org/covd-19-newsroom/covid-19-county-emergency-declarations.

[7] We note at the outset that some of the challenged orders in this case were issued by the Cabinet, and others were issued by the Governor. Therefore, references to the challenged orders will include orders issued by both the Governor and the Cabinet, unless otherwise noted.

[8] Other public-facing businesses required to close included salons and concert venues. Certain essential businesses were permitted to stay open, such as businesses providing food, banks, post offices, hardware stores, and health care facilities. These businesses were subject to minimum requirements, such as maintaining social distance between persons and regularly cleaning commonly touched surfaces.

9

"Healthy at Work" initiative, a phased reopening plan based on criteria set by public health and industry experts to help Kentucky businesses reopen safely. On May 11, 2020, the Commonwealth began reopening its economy and the Cabinet issued minimum requirements that all public and private entities were required to follow, such as maintaining social distance between persons, requiring employees to wash hands regularly, and routinely cleaning and sanitizing commonly touched surfaces.

On May 22, 2020, restaurants were permitted to reopen for in-person dining, subject to 33% maximum capacity for indoor dining. Pertinent to the underlying case, the Cabinet issued an order on June 3, 2020, allowing automobile racing tracks to reopen with specific requirements, such as only allowing authorized employees and essential drivers on the premises, utilizing social distancing, implementing cleaning and disinfecting procedures, and requiring the use of personal protective equipment (PPE) in certain instances.[9]

Florence Speedway, Inc., an automobile racing track in Walton, Kentucky, filed a complaint in the Boone Circuit Court on June 16, 2020, against the Northern Kentucky Independent Health District (NKIHD), the organization charged with enforcing public health orders in Northern Kentucky. The complaint requested judicial review of a series of orders issued by the

---

[9] Personal protective equipment refers to equipment worn for protection from COVID-19 and includes equipment such as face coverings, eye protection, gowns, and gloves. CDC, *Optimizing PPE Supplies,* https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/index.html. In its June 1, 2020 requirements for automobile racing tracks, the Cabinet required that employees, racing crews, and emergency medical crews use appropriate face coverings and other PPE (last updated July 16, 2020).

Governor and the Cabinet, alleging violations of multiple provisions of the Kentucky Constitution. Florence Speedway sought declaratory and injunctive relief deeming the orders unconstitutional and enjoining NKIHD from enforcing them.

Shortly thereafter, Florence Speedway filed an amended verified class action complaint that included Ridgeway Properties, LLC, d/b/a Beans Cafe & Bakery (Beans Cafe), located in Dry Ridge, Kentucky, and Little Links Learning, LLC (Little Links), a childcare center in Fort Wright, Kentucky, as Plaintiffs (collectively referred to as Plaintiffs).[10] In addition to NKIHD, the June 22, 2020 amended complaint included Dr. Lynne Sadler (District Director of the NKIHD), Governor Beshear, the Cabinet, Eric Friedlander (Secretary of the Cabinet), and Dr. Steven Stack (Commissioner of Public Health) as Defendants. Plaintiffs assert that the challenged orders (1) violate Section 1 of the Kentucky Constitution, which protects the rights of life, liberty, pursuit of safety and happiness, and acquiring and protecting property; (2) are arbitrary, in violation of Section 2 of the Kentucky Constitution; (3) violate the separation of powers provisions in Sections 27 and 28 of the Kentucky Constitution; (4) exceed the Governor's statutory authority to act pursuant to KRS 39A.100; and (5) are

---

[10] Theodore J. Roberts was included as a Plaintiff in the amended complaint. Roberts suffers from asthma and alleged that mask usage presents a threat to his health. He was originally a party to the suit because he sought to challenge the mask usage requirements for barber shop patrons. However, on June 25, 2020, Governor Beshear amended the requirements for barbershops, making mask wearing for customers recommended, but not required. Roberts sought to be dismissed from the case on June 29, 2020. It is unclear whether he was dismissed by the trial court, but in any event, he is not named as a party in this appeal.

11

illegal because they violate the procedures outlined in KRS Chapter 13A for the adoption of regulations.

The amended complaint alleges specific issues with particular orders as they pertain to each business.  Florence Speedway alleges that only allowing authorized employees and essential drivers and crews on the speedway premises is arbitrary and discriminatory because outdoor gatherings are safer than indoor gatherings, such as those in restaurants and bowling alleys, which are allowed at 33% capacity.  With outdoor grandstands for spectators, Florence Speedway maintains it could operate at 33% capacity and use social distancing measures and contrasts its restrictions to the requirements for outdoor auctions which have no attendance limitations.  Additionally, Florence Speedway challenges limiting its food service to "carry-out only" as arbitrary and discriminatory given that restaurants are permitted to operate at 33% capacity indoors.  Finally, Florence Speedway claims that requiring PPE with no exceptions is arbitrary and prevents it from complying with the Americans with Disabilities Act.[11]

Beans Cafe raises issues with the requirement that employees must wear PPE (unless it would jeopardize their health) whenever they are near other employees or customers.  The cafe alleges there are no requirements for employees working in the hot kitchen to wear masks, yet face masks are

---

[11] 42 U.S.C. §§ 12101-12213 (2009).

required for other employees.[12]  According to allegations in the amended complaint, little scientific basis exists for requiring face masks because cloth face masks do not protect the wearer, rendering the requirement arbitrary.  The amended complaint also alleges that it is arbitrary and capricious to limit restaurants to 33% indoor capacity and require six feet of distance between customers because these requirements make it difficult, if not impossible, for restaurants to make a profit.

Little Links's allegations pertain to childcare facility restrictions.  Center-based childcare programs, like Little Links, were closed on March 20, 2020, but Limited Duration Centers (LDCs) were permitted to open.  LDCs are childcare programs that provide temporary emergency childcare for employees of health care entities, first responders, corrections officers and Department for Community Based Services's workers.[13]

---

[12] The requirements for restaurants state that "Restaurants should ensure employees wear face masks for any interactions with customers, co-workers, or while in common travel areas of the business (e.g., aisles, hallways, loading docks, breakrooms, bathrooms, entries and exits).  Restaurant employees are not required to wear face masks while alone in personal offices, while more than six (6) feet from any other individual, or if doing so would pose a serious threat to their health or safety."  It is unclear why Beans Cafe states that employees working in the kitchen do not have to wear face masks–whether, due to the hot temperatures, it would pose risks to their health to cover their faces, or whether they are spaced further than six feet apart.  As written, the regulation makes no distinction between employees in the kitchen and those working elsewhere in a restaurant.

[13] On May 8, 2020, Inspector General Adam Mather issued supplemental guidance for verification of employment for childcare within an LDC.  Comparing it to the March 19 guidance, it expands those able to use the LDCs.  It provides that "Employees of a health care entity, First Responders (Law Enforcement, EMS, Fire Departments), Corrections Officers, Military, Activated National Guard, Domestic Violence Shelter Workers, Essential Governmental Workers, large structured physical plants employing 1000 staff or more, and Grocery Workers will be required to submit verification of employment . . . ."  Cabinet for Health and Family Services – Office of

13

All childcare programs were permitted to reopen on June 15, 2020, subject to several requirements, including the following: (1) all childcare programs must utilize a maximum group size of ten children per group; (2) children must remain in the same group of ten children all day without being combined with another classroom; (3) childcare programs may not provide access to visitors or students conducting classroom observations; (4) adults must wear a face mask while inside a childcare program unless doing so would represent a serious risk to their health or safety or they are more than six feet away from any other individual; and (5) children five years of age and younger should not wear masks due to increased risks of suffocation and strangulation. Childcare programs were authorized to recommend to the parents of children over five years of age that their child wear a mask.

Conversely, LDCs were not subject to the ten children group size limitation and were instead subject to a premises requirement of thirty square feet per child. Presumably, if an LDC was particularly large, it could exceed the ten children per group requirement that was imposed on center-based childcare facilities.

Little Links alleges that the ten children per group requirement constitutes a significant limitation on the operation of a childcare facility and forces many providers to operate their businesses at a loss. Additionally,

---

Inspector General, *Coronavirus (COVID-19) – Interim Guidance for Verification of Employment for Child Care within a Limited Duration Center* (May 8, 2020), https://chfs.ky.gov/cv19/ChildCareguidance.pdf.

requiring that children remain in the same group all day poses issues for end-of-the-day operations because childcare centers are not permitted to combine children from the same household in the same room, a customary practice in the childcare industry. Little Links alleges that the fact that these children will be in the same car and household together makes this requirement arbitrary. The prohibition on visitors, according to Little Links in its amendment to the motion for temporary injunction, arbitrarily prevents tours for prospective clients. Lastly, the adult mask requirement presents significant issues in a childcare setting because it is difficult for adults in masks to comfort upset children or assist children in the learning process because non-verbal communication is typically used.

Several of the challenged orders and regulations changed after the filing of the amended complaint, some following the conclusion of injunction proceedings in the circuit court. As of September 1, 2020, center-based childcare programs and LDCs became subject to the same requirements with the promulgation of 922 Kentucky Administrative Regulation (KAR) 2:405E. The regulation permits both center-based childcare programs and LDCs to maintain a maximum group size of fifteen children[14] but maintains the requirement that children remain in the same group throughout the day without combining with another group. In addition, the regulation allows tours to potential clients after regular operating hours if no children are in the facility

---

[14] The group size applies to children age twenty-four months and older.

15

during the tour and the provider ensures all affected areas are cleaned after the conclusion of the tour.  The regulation also provides that childcare providers shall not divide classroom space using a temporary wall in a manner that results in less than thirty-five (35) square feet of space per child.  922 KAR 2:405E.[15]  Further, as of September 1, 2020, the stated purpose for LDCs is "to provide temporary emergency childcare for nontraditional instruction during traditional school hours to meet instructional needs."[16]

On June 22, 2020, the requirements for restaurants were amended, allowing an increase from 33% to 50% indoor dining capacity.  On June 29, 2020, the public-facing businesses order was amended to allow venues and event spaces, including Florence Speedway, to reopen to the public.  The amendment allows 50% of the maximum capacity permitted at a venue, assuming all individuals can maintain six feet of space between them with that level of occupancy.  Additionally, if the venues operate any form of dining service, those services must comply with the requirements for restaurants and bars.

---

[15] *See also* Cabinet for Health and Family Services – Office of the Inspector General, *Novel Coronavirus (COVID-19) Limited Duration Centers Frequently Asked Questions* (Sept. 1, 2020), https://chfs.ky.gov/cv19/FAQLDC.pdf (indicating that each LDC location should account for thirty-five square feet per child).

[16] Cabinet for Health and Family Services – Office of the Inspector General, *supra* n.15*; compare with* Cabinet for Health and Family Services – Office of the Inspector General, *Novel Coronavirus (COVID-19) Limited Duration Centers Frequently Asked Questions* (Mar. 2020), https://childcarecouncilofky.com/wp-content/uploads/2020/03/FAQ-LDCe-003.pdf (identifying LDC to be a center approved to provide temporary emergency childcare to health care employees, first responders, corrections officers and DCBS workers).  *See* 922 KAR 2:405E.

16

On June 24, 2020, Plaintiffs filed in the Boone Circuit Court case an emergency motion for a restraining order pursuant to Kentucky Rule of Civil Procedure (CR) 65.03 and a temporary injunction pursuant to CR 65.04. Alleging irreparable damage to their respective businesses, Plaintiffs requested the circuit court enjoin all further enforcement of the challenged orders.

Meanwhile, in a similar case challenging the constitutionality of the COVID-19 emergency orders, Ryan Quarles, the Commissioner of Agriculture, and Evans Orchard and Cider Mill, LLC (Evans Orchard), filed a complaint in Scott Circuit Court on June 29, 2020. The Attorney General intervened in that action. As the Commissioner of Agriculture, Quarles is charged with promoting agritourism in Kentucky and assisting with sustaining the industry's viability and growth, including the 548 agritourism businesses currently operating in the Commonwealth. Evans Orchard is a family-owned business that operates "agritourism attractions," like pick-your-own fruits, a retail market that sells food products, a cafe and bakery, and an event barn for weddings and other events. Evans Orchard alleged that it would be unable to operate profitably certain aspects of its business while the COVID-19 emergency orders remain in effect. Generally, the complaint alleges that the orders are unconstitutional for the same reasons raised in the Boone County litigation.

On June 30, 2020, the Governor responded in opposition to the Plaintiffs' restraining order/injunction motion, emphasizing the public health measures he and other public officials have taken to slow the escalation of COVID-19. Citing the injunction standard, Governor Beshear argued that Plaintiffs failed

17

to demonstrate a substantial question on the merits of the case because they have no absolute right to operate free from health and safety regulations; failed to establish immediate, irreparable injury; and did not have the equities in their favor given the potential harm to public health and safety if the injunction issued. Additionally, he argued the orders are a valid use of the Commonwealth's police power and the Governor's statutory authority to respond to emergencies. The Governor also noted that since the complaint was filed, the orders were amended to allow restaurants to increase their indoor seating capacity from 33% to 50% and that venues, like the Florence Speedway, could now host 50% of their normal maximum capacity.

Attorney General Daniel Cameron filed a motion to intervene in the Boone Circuit Court action and simultaneously filed an intervening complaint on June 30, 2020.[17] The Attorney General's intervening complaint mirrored several of Florence Speedway's, Beans Cafe's, and Little Links's arguments, and sought the following declarations: KRS Chapter 39A is an unconstitutional delegation of lawmaking authority; the Governor's orders are arbitrary and invalid because they exceed his statutory authority; the Governor's orders must

---

[17] According to the Attorney General, the motion to intervene was filed pursuant to CR 24.01 and CR 24.02 to protect the rights of Kentucky citizens. The Commonwealth has a statutory right to intervene under KRS 15.020, which states that the Attorney General shall "enter his appearance in all cases, hearings, and proceedings in and before all other courts, tribunals, or commissions in or out of the state . . . in which the Commonwealth has an interest." Attorney General Cameron also asserted that the trial court should grant permissive intervention pursuant to CR 24.02 because the Commonwealth sought to assert claims against the same group of state officials as the original complaint for violating the constitutional rights of Kentucky citizens.

be promulgated under the provisions of KRS Chapter 13A; and the Governor's orders violate various sections of the Kentucky Constitution. He also filed a motion for a restraining order on July 1, 2020. The motion asserted that the Governor did not comply with KRS Chapter 39A in declaring an emergency and raised several allegations regarding the legality of the chapter, specifically noting the lack of any time limitations on the Governor's executive orders and suspension of laws.

Additionally, the Attorney General argued that Governor Beshear lacked authority to declare a state of emergency pursuant to KRS 39A.100(1) because KRS 39A.020(12) defines "emergency" as "any incident or situation which poses a major threat to public safety so as to cause, or threaten to cause, loss of life, serious injury, significant damage to property, or major harm to public health or the environment *and which a local emergency response agency determines is beyond its capabilities*." (Emphasis added.) The Attorney General argued that Governor Beshear failed to establish that any local emergency response agency had determined that the situation caused by COVID-19 was "beyond its capabilities." According to the Attorney General, this clause of the statute demonstrates the public policy of the legislature that disaster and emergency response be addressed first as a local matter, so that those closest to the scene of an "emergency" are entrusted with coordinating the response.

The Boone Circuit Court conducted a hearing on the motion for a restraining order on July 1, 2020. No witnesses were called, but the Plaintiffs

provided the trial court with copies of the Healthy At Work Requirements for Automobile Racing Tracks, effective June 1, 2020; the Healthy At Work Requirements for Venue and Event Spaces, effective June 29, 2020; and the Attorney General opinion OAG-19-021.[18]  The next day, the trial court granted Plaintiffs' motion for an emergency restraining order and enjoined the Governor and the Cabinet from enforcing the June 1, 2020 requirements for automobile racing tracks, specifically holding that automobile racing tracks can operate at 50% capacity so long as all individuals could maintain six feet of distance between households.  The trial court also enjoined the Governor and the Cabinet from enforcing the June 8, 2020 requirements that limit group sizes in childcare facilities to ten children and require children to remain in the same group all day.  The restraining order specifically states that childcare programs shall be permitted to maintain a maximum group size of twenty-eight children.

In its July 2 order, the trial court determined that two of the Plaintiffs were entitled to injunctive relief.  The trial court was satisfied that the impending loss of business, including the goodwill built up through years of serving customers, constituted irreparable harm and that the equities favored Florence Speedway and Little Links.  Additionally, the trial court determined that Florence Speedway and Little Links sufficiently established that a

---

[18] The Attorney General's opinion discussed whether a county judge or county executive could invoke the emergency powers of KRS Chapters 39A-39F to fill the position of County Road Supervisor in the absence of action by the Fiscal Court.  The Attorney General opined that this type of vacancy does not constitute an "emergency" as contemplated by KRS Chapters 39A-39F.

substantial question exists on the merits of their claim because "it is unclear what criteria is being used to establish which businesses may survive versus those that must shutter." The trial court specifically identified the fact that attendance at movie theaters is allowed, and the Governor has permitted horse races, yet attending automobile races is not allowed. The trial court scheduled a hearing for July 16, 2020 to hear the Attorney General's motion for a restraining order and Plaintiffs' motion for a temporary injunction.

In response, on July 6, 2020, the Governor filed a petition for a writ of mandamus in the Court of Appeals, along with a motion for intermediate relief pursuant to CR 76.36(4). The petition sought a writ to (1) mandate that the Boone Circuit Court dissolve the July 2, 2020 restraining order; (2) prohibit the Boone Circuit Court from hearing the Attorney General's motion for a restraining order and the temporary injunction motion of the remaining Plaintiffs; and (3) grant intermediate relief staying enforcement of the July 2, 2020 restraining order during the pendency of the writ action. The Governor argued that a writ was necessary because the restraining order negated the statewide public health response to the spread of COVID-19. Further, not only was the restraining order contrary to law but it dangerously eliminated restrictions put in place based on the guidance of public health officials. The Governor insisted that the trial court's decision would inevitably lead to more COVID-19 cases, illnesses, and deaths.

Meanwhile the Scott Circuit Court entered an order on July 9, 2020, enjoining the Governor, and others, from enforcing an executive order against

21

Evans Orchard or any other agritourism business in Kentucky. In addition, the order also stated that prior to issuing any other executive order pursuant to KRS Chapter 39A, the Governor must "specifically state the emergency that requires the order, the location of the emergency, and the name of the local emergency management agency that has determined that the emergency is beyond its capabilities." The Governor also filed a petition for a writ of mandamus with respect to the Scott Circuit Court action, seeking relief similar to that sought in the Boone Circuit Court action.

In the interest of judicial economy, Court of Appeals Judge Glenn Acree issued a consolidated order addressing both the Boone County and Scott County cases and denied intermediate relief in both on July 13, 2020. Judge Acree determined that CR 65, which allows a party to move to dissolve a restraining order, provided the Governor with a swift and adequate remedy, rendering a writ inappropriate. Additionally, he determined that any injury resulting from the Boone Circuit Court order could be rectified at the scheduled July 16, 2020 hearing. The Court of Appeals' order reflects that a three-judge panel would promptly consider the merits of the Governor's petitions for a writ of mandamus.

That same day, Plaintiffs filed an amendment to their motion for a temporary injunction to address new and supplemental orders and regulations issued by the Governor and the Cabinet. Plaintiffs argued that the revised orders were arbitrary and capricious, specifically identifying the six-foot distance requirement and the group size requirements for childcare centers.

22

Plaintiffs noted that LDCs were not subject to the Cabinet's orders. Little Links asserted that the prohibition against visitors poses a significant problem because it prevents Little Links from conducting tours for new families seeking childcare services. Florence Speedway and Beans Cafe also argued that the statewide mask regulation, 902 KAR 2:190E, which states that businesses in continuing violation of the regulation can be immediately shut down, is not authorized by law.

On July 14, 2020, the Governor petitioned for a writ of mandamus in this Court and sought intermediate relief pursuant to CR 76.36(4) and CR 81, specifically requesting that this Court dissolve the Boone Circuit Court's restraining order. The Governor argued that Judge Acree erred in concluding that the Governor has an adequate remedy by appeal because a delayed judicial holding vindicating the Governor's actions offers no protection to the Kentuckians who may become ill, spread the disease to others, or die due to COVID-19 in the interim. The petition also criticized the failure of both lower courts to consider the presumption of constitutionality of the orders since the orders only implicate economic rights, not fundamental rights, requiring only a rational basis review of these emergency measures.

Plaintiffs responded on July 16, 2020, arguing that a writ is not an appropriate remedy because the parties were currently in the midst of an evidentiary hearing on their requested injunctive relief in the Boone Circuit Court, evidence which would be beneficial for this Court to review. They argued the Governor had a remedy by appeal once the trial court issued a

23

ruling based on the hearing. Plaintiffs claimed that Supreme Court intervention at that stage in the proceedings would result in businesses failing, including Florence Speedway and childcare centers across the state. Additionally, Plaintiffs reiterated their arguments regarding the unconstitutionality and illegality of the various orders issued by the Governor and the Cabinet. The Attorney General filed a similar response arguing that the Governor did not satisfy the requirements for issuance of a writ.

The Boone Circuit Court conducted a twelve-and-one-half hour hearing on July 16, 2020. The trial court heard testimony from Plaintiff Christine Fairfield, owner of Little Links; Jennifer Washburn, childcare facility owner; Bradley Stevenson, Executive Director of the Childcare Council of Kentucky, a nonprofit agency located in Lexington, Kentucky, which provides support services to childcare providers; Greg Lee, small business owner; Larry Roberts, Kentucky Secretary of Labor; Josh King, promoter for Plaintiff Florence Speedway; Richard Hayhoe, owner of Plaintiff Beans Cafe and Bakery; John Ellison, general manager and part owner of the Hofbrauhaus, a brew pub, in Newport, Kentucky, as well as board member and past chair of the Kentucky Restaurant Association; Dr. John Garren, University of Kentucky economics professor; Dr. Sarah Vanover, Director of Kentucky's Division of Childcare; and Dr. Steven Stack, Commissioner of the Kentucky Department for Public Health.

Following the close of evidence, Plaintiffs sought a temporary injunction to require the Governor to increase the group sizes in childcare programs to fifteen children, to allow the combination of groups and to allow tours after

24

hours.  They also sought to allow customers at restaurants to sit back-to-back with three and one-half feet of spacing and to remove the "shut down" penalty for a business's continuing violation of the mask mandate.

On July 17, 2020 and pursuant to Section 110 of the Kentucky Constitution, this Court entered an order staying all orders of injunctive relief issued by lower courts of the Commonwealth in COVID-19 litigation pending further action of the Court.  Noting the need for a clear and consistent statewide public health policy, the Court recognized that the Kentucky legislature has expressly given the Governor broad executive powers in a public health emergency.  The stay continues in effect until the full record of proceedings below, including any evidence and pleadings considered by the lower courts, is reviewed by this Court and a final order is issued.  The order expressly authorized the Scott and Boone Circuit Courts to proceed with matters pending before them and issue all findings of fact and conclusions of law they deem appropriate, but no order, however characterized, would be effective.

On July 20, 2020, the Boone Circuit Court issued an order that would have granted the temporary injunction against enforcement of the Governor's orders but for this Court's July 17 stay order.  The trial court determined that Florence Speedway and Little Links will suffer irreparable harm in the form of permanent closure or loss of goodwill under the challenged orders and believed the cafe's claim depends on whether "the executive" has authority to impose

25

the orders.[19]  However, the trial court concluded that the Attorney General's claim of injury depended on whether "the people's" rights are being violated and concluded that they were.  According to the Boone Circuit Court, because the government cannot take inalienable rights, such as the right to acquire and protect property and assemble, and certainly cannot punish a person for exercising a protected constitutional right, the Attorney General established irreparable harm.

In balancing the equities, the trial court noted that the Constitution and Bill of Rights are pitted against "the projections of certain medical professionals" which are "still developing and not all in agreement," citing several studies introduced by Plaintiffs that purportedly contradicted the challenged orders.  The court further noted the Attorney General's argument that the government can have no legitimate interest in violating the constitutional rights of its citizens.  The trial court observed "a decreasing trend in deaths attributed to COVID-19 since mid-April 2020," and that in the period of weeks ending on January 4 and June 27, 2020, 508 persons in Kentucky died from COVID-19, making up only 0.011% of Kentucky's deaths from all causes during that time period.[20]  The trial court disagreed with the

---

[19] The owner of Beans Cafe testified that although the amended orders allow 50% indoor dining capacity, the six-foot distancing requirement limits his available seating to 30%.  The orders limit his ability to function because Beans Cafe closes at 2:00 p.m.  He suggested that if the distance requirement was reduced to three feet, and capacity increased to two-thirds, he would at least be able to break even.

[20] Slightly over four months later the death toll has more than tripled with the total COVID-19 deaths in Kentucky standing at 1,534 on November 5, 2020.  The non-partisan Kaiser Family Foundation has concluded that through October 15, 2020, COVID-19 now ranks third in the leading causes of death in the United States, behind

26

Governor's insistence that equity supports the challenged executive orders, finding that the orders were neither constitutionally enacted nor narrowly tailored. Therefore, in the Boone Circuit Court's view, "the scale of equity tips decidedly to the Constitution and the Bill of Rights."

As to the third requirement that Plaintiffs present a substantial question on the merits, the trial court found no evidence that any local emergency response agency determined that the pandemic emergency was beyond its capabilities pursuant to KRS 39A.020(12). In questioning the scope of the Governor's authority in emergency situations, the trial court concluded that the power is not broad enough "to extinguish the separation of powers, and the inherent rights of Kentuckians, including the right to attend church, to pursue a livelihood, to peaceably assemble, and to seek the health care that they may deem to be essential." Ultimately, the trial court held that the Governor's reliance on KRS Chapter 39A is ineffectual because the Plaintiffs are likely to succeed on the merits of their claims that the emergency powers granted by that chapter violate Sections 1, 2, 15, 27, 28 and 29 of the Kentucky Constitution.

Shortly after the trial court's ruling, on July 22, 2020, the requirements for venues and event spaces, including Florence Speedway, were again revised

---

only heart disease and cancer. *Analysis: COVID-19 Ranks as a Top 3 Leading Cause of Death in the U.S., Higher than in Almost All Other Peer Countries* (Oct. 22, 2020), https://kff.org/coronoavirus-covid-19/press-release/analysis-covid-19-ranks-as-a-top-3-leading-cause-of-death-in-the-u-s-higher-than-in-almost-all-other-peer-countries.

and now state that "[a]ll individuals in the venue or event space must be able to maintain six (6) feet of space from everyone who is not a member of their household." This amendment alleviated one of Florence Speedway's primary issues with the challenged orders.

On August 7, 2020, this Court determined that, with entry of the trial court's July 20 order, the claims in the Boone Circuit Court case were ripe for review. The order also noted that no further action had occurred in the Scott Circuit Court case since it entered the restraining order on July 9, 2020. Although the Court of Appeals consolidated the Boone and Scott Circuit Court cases for purposes of judicial economy, this Court found that the cases are no longer similarly situated since only the Boone Circuit Court matter proceeded to an injunction hearing. Accordingly, the Court deconsolidated the two actions.[21] Oral argument on September 17, 2020, focused on the legal issues Plaintiffs and the Attorney General raised in the Boone Circuit Court challenging the Governor's COVID-19 executive orders and regulations.

## ANALYSIS

Before turning to the specific issues presented, we briefly address the history of emergency powers legislation, which has existed in Kentucky since 1952.[22] On March 5, 1952, the General Assembly enacted Chapter 39 of the

---

[21] The order states that the Scott Circuit Court may proceed with matters before it and issue all findings of fact and conclusions of law it finds appropriate. The Court stated that any orders issued in the case should, after entry, be immediately transmitted to the Clerk of the Supreme Court.

[22] In 1949, the Soviet Union successfully tested its first nuclear weapon. U.S. Department of Homeland Security National Preparedness Task Force, *Civil Defense and Homeland Security: A Short History of National Preparedness Efforts* (Sept. 2006),

28

Kentucky Revised Statutes, relating to civil defense. 1952 Ky. Acts ch. 58. While the stated purpose of the Act included minimizing the destructiveness caused by "fire, flood or other causes," preparing the state for emergencies and protecting the public, much of the Act specifically related to Kentucky's defense mechanisms for an enemy attack. *Id.* at § 1. The Act authorized the Governor to make necessary orders and regulations to carry out the provisions of the Act and to prepare a comprehensive plan for civil defense. *Id.* at § 9. In 1974, the Act was amended to create a state agency, the Department of Disaster and Emergency Services, in lieu of a state civil defense agency in order to focus on emergency response generally rather than civil defense matters only. Legis. Rec. Final Exec. Action - April 23, 1974, Reg. Sess. at 23 (Ky. 1974). In addition, the amendment redefined and expanded the scope of emergencies covered under the Chapter.[23] 1974 Ky. Acts ch. 114, § 1. Additionally, KRS 39.401, the definitions portion of the Chapter, added the definition of

---

https://training.fema.gov/hiedu/docs/dhs%20civil%20defense-hs%20-%20short%20history.pdf. Fearing an imminent attack, local officials began demanding that the federal government create a plan for handling crisis situations. *Id.* While President Truman agreed that the United States should outline its civil defense functions, he believed that civil defense responsibilities should fall primarily on state and local governments. *Id.* On January 12, 1951, the Federal Civil Defense Act of 1950 was signed into law, which was the first comprehensive legislation pertaining to disaster relief. 64 Stat. 1245 (1951). The Act states: "It is further declared to be the policy and intent of Congress that this responsibility for civil defense shall be vested primarily in the several States and their political subdivisions." *Id.*

[23] For example, instead of focusing on civil defense, the 1974 version of the statute specifically added a definition for "disaster and emergency response," which includes "preparation for and the carrying out of all emergency functions, other than functions for which military forces are primarily responsible." The amendment also included "natural or man caused disasters," explosions, and transportation emergencies, among others, in the list of disasters and emergencies.

"disaster," which was defined as "any incident or situation declared as such by executive order of the Governor pursuant to the provisions of this Act." *Id.* at § 2.

Recognizing that the Commonwealth is always subject to both contained and widespread threatening occurrences, in 1998 the General Assembly replaced KRS Chapter 39 with KRS Chapter 39A, which establishes a statewide comprehensive emergency management system.[24] In enacting the Chapter, the General Assembly expressly noted that "response to these occurrences is a fundamental responsibility of elected government in the Commonwealth." KRS 39A.010. KRS Chapter 39A further expanded the scope of disasters and emergencies which necessitate the Governor's response and, notably, added biological and etiological hazards to the list of threats to public safety. The General Assembly recognized that the purpose of Kentucky's emergency management response had evolved from responding only to security and defense needs to responding to all types of natural and man-made hazards in order to address the contemporary needs of Kentucky citizens. KRS 39A.030. As reflected in Appendix A to this Opinion, KRS Chapter 39A powers have been invoked by every Governor who has served since the law's adoption in 1998. The emergencies have ranged from widespread events such as destructive storms to more localized concerns such as bridges and water supply. Since

---

[24] *Omnibus Revision of Disaster and Emergency Services Laws: Hearing on H.B. 453*, H. State Gov't Comm., 1998 Reg. Leg. Sess. 23 (Feb. 24, 1998) (statement of Rep. Charles Geveden, Chairman).

1996, an emergency of some magnitude has been declared on approximately 115 occasions, leaving aside the accompanying orders in the face of those occurrences which prohibit price gouging or allow pharmacists to address prescription needs. As we address the issues in this case, we are cognizant of the Commonwealth's history and experience with emergency response.

## I. The Governor Properly Invoked His Emergency Powers Pursuant to KRS 39A.100 by Declaring a State of Emergency Based on the "Occurrence" of One of the "Situations or Events" Contemplated by KRS 39A.010.

KRS 39A.100(1) recognizes the Governor's authority to declare a state of emergency and exercise emergency powers. The first sentence states: "In the event of the occurrence or threatened or impending occurrence of any of the situations or events contemplated by KRS 39A.010, 39A.020 or 39A.030, the Governor may declare, in writing, that a state of emergency exists." KRS 39A.100(1). KRS 39A.010, relevant here, is a statement of "Legislative intent-Necessity" and, although lengthy, justifies extensive quotation:

> The General Assembly realizes the Commonwealth is subject at all times to disaster or emergency occurrences which can range from crises affecting limited areas to widespread catastrophic events, and that response to these occurrences is a fundamental responsibility of elected government in the Commonwealth. It is the intent of the General Assembly to establish and to support a statewide comprehensive emergency management program for the Commonwealth, and through it an integrated emergency management system, in order to provide for adequate assessment and mitigation of, preparation for, response to, and recovery from, the threats to public safety and the harmful effects or destruction resulting from all major hazards, including but not limited to: flood, flash flood, tornado, blizzard, ice storm, snow storm, wind storm, hail storm, or other severe storms; drought, extremes of temperature, earthquake, landslides, or other natural hazards; fire, forest fire, or other conflagration; enemy attack, threats to public safety and health involving nuclear, chemical, or biological agents or weapons; sabotage, riot, civil disorder or acts of terrorism, and

31

other domestic or national security emergencies; explosion, power failure or energy shortages, major utility system failure, dam failure, building collapse, other infrastructure failures; transportation-related emergencies on, over, or through the highways, railways, air, land, and waters in the Commonwealth; emergencies caused by spill or release of hazardous materials or substances; mass-casualty or mass-fatality emergencies; other technological, biological, etiological, radiological, environmental, industrial, or agricultural hazards; or other disaster or emergency occurrences; or catastrophe; or other causes; and the potential, threatened, or impending occurrence of any of these events; and in order to protect life and property of the people of the Commonwealth, and to protect public peace, health, safety, and welfare, and the environment; and in order to ensure the continuity and effectiveness of government in time of emergency, disaster, or catastrophe in the Commonwealth, . . . .

The statute continues by declaring the necessity for: (1) the creation of a state agency, the Division of Emergency Management; (2) the conferring of emergency powers upon the Governor and local officials; (3) mutual aid agreements between local, state and federal governments; and (4) the establishment of a "statewide comprehensive emergency management program and integrated emergency management system."

Preliminarily, we note the obvious, namely that our General Assembly has identified dozens of potential disasters, catastrophes, hazards, threats and emergencies which the Commonwealth may encounter–and in many instances has encountered–and has wisely provided for the exercise of emergency powers in those extraordinary circumstances. Our first responsibility is to determine what the legislature intended by examining carefully the laws enacted. When construing statutes we examine the language used to determine legislative intent, *Stephenson v. Woodward*, 182 S.W.3d 162, 169-70 (Ky. 2005), and if

32

that language is clear and unambiguous, we look no further. *Richardson v. Louisville/Jefferson Cty. Metro Gov't*, 260 S.W.3d 777, 779 (Ky. 2008).

Here KRS 39A.100, in clear and unambiguous language, authorizes the Governor to declare a state of emergency "in the event of the occurrence or threatened or impending occurrence" of any of the events or situations listed in KRS 39A.010, which expressly include "biological . . . or etiological . . . hazards."[25]  In short, the COVID-19 pandemic is the occurrence of both a biological hazard, generally, and an etiological hazard, more specifically, justifying the Governor's March 6, 2020 declaration of emergency.  Our statutory analysis in this case is essentially a straight line from the first sentence of KRS 39A.100 to the contents of KRS 39A.010.  With the "plain language" of these controlling statutes clear, "our inquiry ends." *Univ. of Louisville v. Rothstein*, 532 S.W.3d 644, 648 (Ky. 2017).

Confronted with this straightforward statutory construction route, Plaintiffs and the Attorney General argue for a detour to the "Definitions for KRS Chapters 39A to 39F" set forth in KRS 39A.020, in particular the definition of "emergency."  KRS 39A.020(12) states:

> "Emergency" means any incident or situation which poses a major threat to public safety so as to cause, or threaten to cause, loss of life, serious injury, significant damage to property, or major harm to public health or the environment

---

[25] "Etiological" is defined as "causing or contributing to the development of a disease or condition."  Oxford English Dictionary Online, *Etiological,* www.oed.com/view/Entry/3265 (accessed Oct. 28, 2020).  The COVID-19 pandemic is properly deemed both an etiological hazard as well as a biological hazard, the genesis of the pandemic being a novel coronavirus.

**and which a local emergency response agency determines is beyond its capabilities.**

(Emphasis added.)

Focusing on the closing phrase, Plaintiffs and the Attorney General argue that the Governor was required to seek authority from local agencies in all 120 counties before declaring a state of emergency throughout the Commonwealth. The Boone Circuit Court agreed with this argument and concluded that "a certification by the local government that the matter is beyond its capabilities" was required "before [an] emergency is declared." While we do not find this statutory detour appropriate under controlling principles of statutory construction, following this route leads to the same result, namely express statutory authority for the Governor to act as he did in declaring a state of emergency.

First, we note that the grant of authority to the Governor in KRS 39A.100 does not reference the definition of "emergency" or in any way signal that in declaring a state of emergency the Governor is limited by that definition. If the General Assembly intended that important limitation on the Governor's authority it would have said so explicitly. Confronting a similar statutory construction argument in *Whitman v. American Trucking Associations, Inc.,* 531 U.S. 457 (2001), the United States Supreme Court, through Justice Scalia, wrote "that textual commitment must be a clear one. Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions–it does not, one might say, hide elephants in mouseholes." Requiring the Governor to consult with local emergency agencies in 120

34

counties would certainly "alter the fundamental details," *id.*, of the straightforward emergency declaration authority in KRS 39A.100. Our General Assembly did not direct the Governor (or any reader of the statute for that matter) to the definition of "emergency" as a limitation on gubernatorial authority, and we are not at liberty to add that language to the statute. *Stephenson,* 182 S.W.3d at 171 (citing *Commonwealth v. Harrelson,* 14 S.W.3d 541, 546 (Ky. 2000)). Further, as the Governor notes, the term "declared emergency," is defined in relevant part as "any incident or situation declared to be an emergency by executive order of the Governor." KRS 39A.020(7). Ultimately, the Governor's power to declare a state of emergency is controlled by KRS 39A.100 and, in this case, KRS 39A.010; these KRS 39A.020 definitions are not limitations on his authority.

Second, the term "local emergency response agency," as used in the aforementioned "emergency" definition is never defined in KRS Chapter 39A. KRS 39A.020(15) has a definition for "local emergency management agency," KRS 39A.020(10) for "disaster and emergency response," and KRS 39A.020(14) for "local disaster and emergency services organization," but "local emergency response agency" appears nowhere in KRS Chapter 39A except that one reference in the KRS 39A.020(12) definition of "emergency."[26] Assuming it is a

---

[26] Indeed, the only other use of the term "local emergency response agency/agencies" in the entire Kentucky Revised Statutes is in KRS 352.640, a statute in the Mining Regulations chapter of Section XXVIII pertaining to Mines and Minerals. This particular statute requires the development of an emergency action plan to be used in the event of a mine emergency and requires the plan to include phone numbers for various officials and agencies including "state, federal, and local emergency response agencies."

drafting error and the intended reference is to "local emergency management agency," the closest terminology discoverable, then KRS Chapter 39B, "Local Emergency Management Programs" becomes relevant. This chapter deals with the creation and operation of local emergency management agencies and outlines their powers, authority and duties. Significantly, KRS 39B.010(5) states:

> All local emergency management agencies or local disaster and emergency services organizations in the Commonwealth, and the local directors, and members of each, **shall, for all purposes**, **be under the direction of** the director of the [D]ivision [of Emergency Management], **and of the Governor when the latter deems that action necessary.**

(Emphasis added.)

Given that the Governor has ultimate authority "for all purposes," *id.*, over all local emergency management agencies, even if the detour to the "emergency" definition in KRS Chapter 39A were justified, we would be compelled to conclude the Governor had the authority to act without regard to the determination of any local agency regarding whether the COVID-19 pandemic at hand was beyond its capabilities. The Governor is authorized to assume the "direction" of those agencies and could simply deem it "necessary" that they acknowledge that a pandemic is beyond their capabilities. KRS

---

While "local emergency response agency" is not defined and that whole term is referenced only once in KRS 39A.020(12), a review of Chapters 39A and 39B provides an idea of the various entities involved in emergency response. *See* KRS 39A.020(10), KRS 39B.050(1)(f), KRS 39B.070(3). However, no indication exists that any of these entities would assume a role larger than the emergency management director, *see* KRS 39B.020(3)(d), KRS 39B.030, 39B.030(7)(a), whose role in conjunction with elected officials is further discussed below.

39B.010(5). This conclusion is further reinforced by KRS 39A.100(1)(a) which empowers the Governor "to assume direct operational control of all disaster and emergency response forces and activities in the Commonwealth."[27]

Moreover, even if the focus on the statutory definition of "emergency" urged by the Plaintiffs and the Attorney General led to the result they seek–a limitation on the Governor's emergency powers until he has consulted with agencies in all 120 counties–we would be compelled to consider another guiding principle of statutory construction. Courts must always presume that the legislature did not intend for a statute to produce an absurd result. *Layne v. Newberg*, 841 S.W.2d 181, 183 (Ky. 1992) (particular construction of statute rejected because it "flies in the face of the stated purpose of the [Workers' Compensation] Act"). As the extensive list in KRS 39A.010 reflects, numerous natural and man-made events and occurrences can pose serious and immediate danger to the Commonwealth and thus require a prompt and effective response. The prospect that a Governor would need to consult with and defer to 120 different local agencies before he or she could declare a statewide emergency in the face of an immediate and fast-moving threat to the entire Commonwealth strains rational understanding.

---

[27] Also, factually significant for present purposes, as discussed below, the General Assembly itself in 2020 Senate Bill 150 explicitly recognized the Governor's emergency declaration and provided that the Governor "shall declare" when the state of emergency ceases, and if the declared emergency had not ceased "on or before the first day of the next regular session of the General Assembly, the General Assembly may make the determination."

The *amicus curiae* emphasize that the Governor's COVID-19 website

reflects that on March 9, 2020, three days after his declaration, Governor

Beshear called all 120 county-judge executives to update them and discuss

emergency management.[28]  Updating local officials is obviously different from

seeking 120 county-specific determinations of capability to cope with a

particular occurrence or event.  And two questions arise.  First, from whom

would the Governor seek that determination?  The "emergency" definition does

not reference a local official, such as the county-judge executive or mayor, but

refers explicitly to a situation "which a local emergency response agency

determines is beyond its capabilities."  KRS 39A.020(12).  Literally and again

assuming the drafting error discussed above, it would appear the

determination regarding local capabilities lies, at least in the first instance,

with the director of the local emergency management agency, *see* KRS

39B.030, not elected local officials.[29]  Second, is it logical that the General

Assembly would intend a patchwork approach to a statewide emergency?  KRS

39A.020(12) seems to require individualized, local determinations so the

outcome of the Governor's outreach under the Plaintiffs' and Attorney General's

---

[28] *See Kentucky's Response to COVID-19*, Kentucky Governor Andy Beshear, https://governor.ky.gov/covid-19 (last updated Oct. 1, 2020).

[29] Further complicating the matter is the fact that KRS 39A.100(2) gives authority to declare a local emergency to the local executive officers, such as county judge-executives, mayor of a city or urban-county government, or other local chief executives as provided by ordinance.  Also, KRS 39B.020 provides that the local executive officer, e.g., county judge-executive, "shall appoint" the director of the local emergency management agency and that director shall serve "at the pleasure of the appointing authority."  So even if KRS 39A.020(12) requires a determination by the emergency agency, arguably the local executive officer ultimately controls the decision.

theory would not be a simple "majority rules" approach but rather a county-by-county approach, potentially leaving pockets of the Commonwealth under a state of emergency while others are not. The confusion and inconsistency brought about by this approach in the face of a threat to the entire state is obvious.

That is not to say that the need for consultation with and deference to local authorities is never appropriate. KRS 39A.010 refers to the legislative intent to address "disasters or emergency occurrences which can range from crises affecting limited areas to widespread catastrophic events." Thus, for "crises affecting limited areas" consultation with a "local emergency management agency" would be entirely appropriate and necessary but for those events or occurrences, such as a pandemic, which affect the whole of the Commonwealth (indeed the nation and the globe) and require a prompt response the necessity for consulting 120 county-level authorities is problematic at best.

In sum, the Governor properly declared a state of emergency pursuant to KRS 39A.100 because the COVID-19 pandemic constitutes the "occurrence" of a biological and etiological hazard as delineated in KRS 39A.010. Any focus on the specific definition of "emergency" in KRS 39A.020(12) is not appropriate under principles of plain language construction, but if it were, it appears the referenced "local emergency response agenc[ies]" are actually the local emergency management agencies. Those agencies are "under the direction of the [D]irector of the [D]ivision [of Emergency Management]" and, ultimately,

39

"the Governor when the latter deems that action necessary." KRS 39B.010(5). So even if the definition of "emergency" in some way altered or affected the first sentence of KRS 39A.100, the result is the same. The Governor was not required to consult with any local government, official, or agency in determining that COVID-19 was a hazard justifying declaration of a state of emergency for the entire Commonwealth.

## II. During the Emergency, the Governor Has Exercised Executive Powers But to the Extent, If Any, KRS Chapter 39A Grants Him Legislative Authority, No Violation of the Separation of Powers Provisions of the Kentucky Constitution Has Occurred, the General Assembly Having Properly Delegated that Authority.

The Kentucky Constitution directs the separation of powers among the legislative, executive and judicial branches, § 27, and prohibits any one branch from exercising "any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted," § 28. The Governor maintains that in responding to the COVID-19 pandemic he has exercised executive powers derived from the Kentucky Constitution and that KRS Chapter 39A simply "recognizes, defines, and constrains" executive authority to direct an emergency response. To the extent any of his actions could be characterized as legislative, he notes that he is exercising authority lawfully delegated to him by the General Assembly in KRS Chapter 39A.

The Attorney General seemingly acknowledges some role for the Governor in the event of an emergency such as COVID-19 but generally insists that the Governor's response these last months via executive orders and emergency regulations is an unconstitutional encroachment on legislative authority. In

40

advocating the striking of those portions of KRS Chapter 39A that permit the Governor to exercise legislative authority, particularly KRS 39A.100(1)(j) and KRS 39A.180(2), the Attorney General asks us to "use this case to restore the original meaning of the Constitution's separation of powers."[30] To the extent we decline that invitation, he argues that the legislative authority in KRS Chapter 39A has been improperly delegated to the Governor. As we consider this argument, we do so guided by the presumption that the challenged statutes were enacted by the legislature in accordance with constitutional requirements. *Cornelison v. Commonwealth*, 52 S.W.3d 570, 572 (Ky. 2001). "A constitutional infringement must be 'clear, complete and unmistakable' in order to render the statute unconstitutional." *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 806 (Ky. 2009) (citing *Kentucky Indus. Util. Customers, Inc. v. Kentucky Utils. Co.,* 983 S.W.2d 493, 499 (Ky. 1998)). Ultimately, we conclude that the Governor is largely exercising emergency executive power but to the extent legislative authority is involved it has been validly delegated by the General Assembly consistent with decades of Kentucky precedent, which we will not overturn.

---

[30] Citing, *inter alia,* Blackstone's *Commentaries on the Laws of England*, John Locke, and *The Federalist Papers*, the Attorney General emphasizes the historical and philosophical underpinnings of the separation of powers principle. While these sources provide context, this Court's North Star is our own Kentucky Constitution, the language used and the tripod structure erected for Kentucky government.

The current Kentucky Constitution, emanating primarily from the 1890 Constitutional Convention,[31] does not address emergency occurrences or events[32] directly except as to military matters which are firmly assigned to the Governor as the "commander-in-chief" of military affairs. § 75. Generally, Section 69 vests the Governor with the "supreme executive power of the Commonwealth" and Section 81 mandates the Governor "take care that the laws be faithfully executed." Also instructive for the present case, Section 80 provides that the Governor "may, on extraordinary occasions, convene the General Assembly at the seat of government, or at a different place, if that should have become dangerous from an enemy or from contagious diseases . . . . When he shall convene the General Assembly it shall be by proclamation, stating the subjects to be considered, and no other shall be considered."[33]

Although "extraordinary occasions" has been construed customarily to allow special legislative sessions for reasons of immediate import relating to

---

[31] *See generally Official Report of the Proceedings and Debates in the Convention Assembled at Frankfort, on the Eighth Day of September 1890, to Adopt, Amend or Change the Constitution of the State of Kentucky* (1890).

[32] "Emergency" only appears twice in the Kentucky Constitution. Section 55 provides that an act containing an emergency clause becomes effective upon the Governor's approval, rather than ninety days after adjournment of the session in which passed. Section 158 allows cities, counties and taxing districts to exceed their debt limit to cope with emergencies. "Extraordinary occasion" appears in the Constitution only in Section 80, which provides the Governor "may, on extraordinary occasions, convene the General Assembly."

[33] A similar provision has appeared in all four Kentucky Constitutions. *See* Ky. Const. of 1891, § 83; Ky. Const. of 1850, art. 3, § 13; Ky. Const. of 1799, art. 3, § 14; Ky. Const. of 1792, art. 2, § 3.

funding and other matters,[34] it plainly extends to those events or occurrences that qualify as a natural or man-made emergency, underscored by the "clue" regarding the convening of the legislature somewhere other than Frankfort in the event of an enemy or contagious diseases. Notably, Section 80 contains the permissive "may . . . convene" as opposed to the mandatory "shall . . . convene." Even in times when the Commonwealth is confronted with something extraordinary, to include enemies and contagious diseases, the decision to convene the General Assembly in a special session is solely the Governor's.

The implied tilt of the Kentucky Constitution toward executive powers in times of emergency is not surprising, given our government's tripartite structure with a legislature that is not in continuous session. At least two commentators have opined that "[t]he sixty-day limit on biennial sessions was the most significant restriction placed on the General Assembly by the [1890] Constitutional Convention." Sheryl G. Snyder & Robert M. Ireland, *The Separation of Governmental Powers under the Kentucky Constitution: A Legal and Historical Analysis of L.R.C. v. Brown*, 73 Ky. L.J. 165, 181 (1984). Under the 1792 and 1799 Kentucky Constitutions the General Assembly met

---

[34] *See, e.g.*, 2007 First Extraordinary Session (alternative energy policies, appropriation of funds for capital projects and road construction, taxation of military pay, pretrial diversion for substance abusers, and public employee insurance plans); 1997 First Extraordinary Session (postsecondary education and budget modifications); 1983 Extraordinary Session (flat rate tax on individual income, standard deduction increase on personal income, and state-federal tax uniformity). Legislative Research Commission, *Extraordinary Session since 1940,* https://legislature.ky.gov/Law/ Statutes/ Pages/KrsExtraOrdList.aspx (last visited Oct. 28, 2020).

annually with no restrictions on length of session, but under the 1850 Constitution that changed to biannual sixty-day sessions with power in the body to extend the session on a two-thirds vote in each house, which they often did. *Id.* So, before the 1890 Convention "the legislature had the power to hold continuous sessions," but "the framers of the present Constitution took that power away . . . and, for the first time in the history of Kentucky, put an absolute limit on the number of days the legislature could sit." *Id.*

When the present Constitution was adopted in 1891, the Kentucky General Assembly could only meet for sixty days every other year, Ky. Const. § 42, and the only power to call the legislature into an extraordinary session resided in the Governor, Ky. Const. § 80. Even now after the 2000 constitutional amendments with the legislature convening annually, sessions are limited to thirty legislative days in odd-numbered years, Ky. Const. § 36, and sixty legislative days in even-numbered years, Ky. Const. § 42.[35] 2000 Ky. Acts ch. 407, § 1, ratified November 2000. Moreover, the odd-numbered year sessions cannot extend beyond March 30 and the even-numbered year sessions cannot extend beyond April 15. Ky. Const. § 42. And the power to convene in extraordinary session remains solely with the Governor. Ky. Const. § 80.

---

[35] In 1966, 1969 and 1972 constitutional amendments were proposed that would have amended the Constitution "to enable [the General Assembly] once again to become 'a continuous body,' but each proposed amendment was defeated by the people." Snyder & Ireland, 73 Ky. L.J. at 182.

Having a citizen legislature that meets part-time as opposed to a full-time legislative body that meets year-round, as some states have,[36] generally leaves our General Assembly without the ability to legislate quickly in the event of emergency unless the emergency arises during a regular legislative session. The COVID-19 pandemic arose during the latter part of the 2020 legislative session, after the deadline for introducing a new bill, resulting in fourteen proposed COVID-19 related amendments to existing bills, five of which eventually passed.[37]  Most notably, Senate Bill 150, "AN ACT relating to the

---

[36] Two states that have recently dealt with challenges to the authority of their Governor/executive branch officials during the COVID-19 pandemic, Michigan and Wisconsin, are examples.  Pursuant to Michigan Constitution Article IV, Section 13, the Michigan legislature begins its session in January each year and remains in session year-round, with both the House and the Senate meeting an average of eight days per month in 2020.  The Michigan legislature was thus readily available to address concerns presented by the pandemic.  2020 Session Schedule, Michigan House of Representatives, https://www.house.mi.gov/PDFs/Current_Session_ Schedule.pdf (last visited Oct. 8, 2020); Session Schedule 2020, Michigan State Senate, https://senate.michigan.gov/maincalendar.html (last visited Oct. 8, 2020). The Wisconsin legislature meets annually, Wis. Stat. Ann. § 13.02, and was in session this year from January 14, 2020 until May 13, 2020.  Article V, Section 4 of the Wisconsin Constitution authorizes the governor "to convene the legislature on extraordinary occasions."  Additionally, Article IV, Section 11 provides that "[t]he legislature shall meet at the seat of government at such time as shall be provided by law," a provision which has been construed to allow the legislature to convene itself in an extraordinary session. *League of Women Votes of Wisconsin v. Evers*, 929 N.W.2d 209, 216 (Wis. 2019).  Thus, the Wisconsin legislature also had the means to address immediately any needed COVID-19 response.

[37] Appendix B lists all COVID-19 related legislation introduced in the 2020 Session.  Of the fourteen COVID-19-related amendments, five passed, the most expansive of which was Senate Bill 150.  This bill addresses COVID-19's effects on the Commonwealth by expanding unemployment benefits, facilitating and providing protection for expanded healthcare efforts, and allowing the Governor or applicable administrative bodies to suspend or waive business licensing, renewal, and application fees during the state of emergency.  In addition, it (1) pertains to state requirements for tax filing and payment; (2) allows court-ordered counseling or education to be conducted by video or telephone conferencing; (3) allows agricultural industry employees to operate vehicles that would normally require a special operator's license; (4) permits food service establishments to sell food items like bread and milk and other staple items to any customer; (5) suspends and tolls deadlines relating to hearings and

45

state of emergency in response to COVID-19 and declaring an emergency,"

acknowledged the Governor's declared emergency and provided:

> Notwithstanding any state law to the contrary, the Governor shall declare, in writing, the date upon which the state of emergency in response to COVID-19, declared on March 6, 2020, by Executive Order 2020-215, has ceased. In the event no such declaration is made by the Governor on or before the first day of the next regular session of the General Assembly, the General Assembly may make the determination.

2020 S.B. 150, § 3. The legislature thereby signaled its awareness of the

emergency and that the Governor was undertaking to exercise the emergency

powers under KRS Chapter 39A. Thus, even within the confines of limited

legislative sessions, the timing of this particular emergency was such that the

legislature had a few weeks to pass bills related to the COVID-19 pandemic and

did so.

The Attorney General invites the Court to adopt a strict separation of

powers stance by identifying the Governor's issuance of any rules, regulations

or orders in an emergency as exercises of non-delegable legislative power

(excepting only the Governor's initial declaration of an emergency perhaps) and

then holding those emergency responses constitutionally invalid under

---

decisions in local legislative bodies, boards and commissions; (6) allows public agencies ten days to respond to an open records request; (7) allows restaurants to sell alcohol for carryout and delivery; (8) provides that businesses that manufacture or provide personal protective equipment or personal hygiene supplies that do not do so during their regular course of business shall have a defense to ordinary negligence and product liability, so long as they act reasonably and in good faith; (9) allows the State Board of Medical Licensure, Board of Emergency Medical Services, and Board of Nursing to waive or modify licensure and scope of practice requirements and expand medical students' authority; and (10) allows individuals to be deemed in the presence of one another for signatures, testimony, or notarization if they are communicating via real time video conference.

46

Sections 27 and 28. We decline. First, our reading of the Kentucky Constitution leaves us with no evidence that the powers at issue must be deemed legislative. The "extraordinary occasion," § 80, of a global pandemic gives rise to an obvious emergency and, as noted, the Constitution impliedly tilts to authority in the full-time executive branch to act in such circumstances. Indeed, the Governor's "commander-in-chief" status under Section 75 reinforces the concept. Second, the structure of Kentucky government as discussed renders it impractical, if not impossible, for the legislature, in session for only a limited period each year, to have the primary role in steering the Commonwealth through an emergency.

On this latter point, the Attorney General argues that Section 80 allows the Governor to call an extraordinary session and thus "envisions that the Governor will not go it alone during a crisis, but instead will work hand in hand with the People's representatives." Again, the language of the section is permissive not mandatory, leaving it to the Governor–also duly elected by the People–whether the General Assembly should be convened. Moreover, the view advocated by the Attorney General creates an obvious dilemma: if the Governor is not empowered to adopt emergency measures because that constitutes "legislation," the Commonwealth is left with no means for an immediate, comprehensive response because either the General Assembly is not in session and cannot convene itself or even if in session it will have limited time to deal with the matter under constitutionally mandated constraints on the length of

47

the session.[38]  So, our examination of the Kentucky Constitution causes us to conclude the emergency powers the Governor has exercised are executive in nature, never raising a separation of powers issue in the first instance.

Fortunately, the need to definitively label the powers necessary to steer the Commonwealth through an emergency as either solely executive or solely legislative is largely obviated by KRS Chapter 39A, "Statewide Emergency Management Programs," which reflects a cooperative approach between the two branches.  Plaintiffs and the Attorney General insist that the statute is in large part unconstitutional, however, because it grants the Governor legislative authority in violation of the nondelegation doctrine.  We disagree.

We acknowledge, of course, that making laws for the Commonwealth is the prerogative of the legislature.  Addressing a statute that authorizes the Governor to reorganize governmental bodies during the period between annual legislative sessions, we recently observed, "[t]he legislative power we understand to be the authority under the constitution to make the laws, and to alter and repeal them."  *Beshear v. Bevin*, 575 S.W.3d 673, 682 (Ky. 2019) (quoting *Purnell v. Mann*, 50 S.W. 264, 266 (Ky. 1899)).  "The nondelegation doctrine recognizes that the Constitution vests the powers of government in three separate branches and, under the doctrine of separation of powers, each

---

[38] This is particularly true in the case of an emergency that goes from an acute stage to chronic, as is the case with a pandemic.  Unlike an ice storm, wildfires or other natural events which sweep across all or part of the state, leaving destruction, but ending in a relatively short time, a biological/etiological hazard can hover for weeks and even months.

branch must exercise its own power rather than delegating it to another branch." *Id.* at 681 (citing *TECO Mech. Contractor, Inc. v. Commonwealth,* 366 S.W.3d 386, 397 (Ky. 2012)). Nevertheless, we found KRS 12.028, at issue in that case, to be a valid delegation of legislative power, recognizing that legislative power can be delegated "if the law delegating that authority provides 'safeguards, procedural and otherwise, which prevent an abuse of discretion'" thereby "'protecting against unnecessary and uncontrolled discretionary power.'" *Id.* at 683 (citations omitted). Our holding was but one in a series of Kentucky cases over several decades addressing the proper delegation of legislative power.[39]

The United States Supreme Court in *J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409 (1928) held that "[i]f Congress shall lay down by legislative act an *intelligible principle* to which the person or body authorized to [act] . . . is directed to conform, such legislative action is not a forbidden delegation of legislative power." (Emphasis added.) Recognition of the delegation of legislative powers in Kentucky largely began with *Commonwealth v. Associated Industries of Kentucky,* 370 S.W.2d 584, 586 (Ky. 1963): "We find

---

[39] In the seminal case, *Legislative Research Commission v. Brown,* 664 S.W.2d 907, 930 (Ky. 1984), this Court addressed the Governor's statutorily granted power to reorganize state government between legislative sessions and concluded once the General Assembly "determines that that power is in the hands of the Governor, such interim action is purely an executive function." However, in *Beshear v. Bevin,* 575 S.W.3d at 681-83, addressing the same statute but perceiving a factual distinction, a majority of this Court concluded that the statute was a "grant of legislative authority to the executive" and that the Governor was exercising legislative power. *But see id.* at 685 (VanMeter, J., concurring in result only) ("In my view, [the Governor] is exercising his 'executive power' as authorized by the legislature and the Kentucky Constitution.").

nothing in our State Constitution that declares explicitly: 'Legislative power

may not be delegated.'" Noting the seminal role of John Locke in the

articulation of democratic principles and his insistence that the power to make

laws remain always in the hands of the legislature, the Court continued:

> Locke believed that all human ideas, even the most complex
> and abstract, ultimately depended upon 'experience' to
> dedicate their truth . . . . So, if Locke was the fountainhead of
> the thesis that power could not be delegated, we feel sure that
> the experience of the last several centuries would have caused
> him to repudiate this idea. Experience has demonstrated some
> of the power must be invested in other bodies so that the
> government may function in a world that progressively is
> becoming more complex. There is nothing wrong with this so
> long as the delegating authority retains the right to revoke the
> power.

*Id.* at 588.[40] More recently, in *Board of Trustees of Judicial Form Retirement

System v. Attorney General,* 132 S.W.3d 770, 781 (Ky. 2003), we recognized

"given the realities of modern rule-making" a legislative body "has neither the

time nor the expertise to do it all; it must have help." (Citing *Mistretta v. United

States,* 488 U.S. 361, 372 (1989)). Examining the nondelegation doctrine

generally and finding the "intelligible-principle rule" instructive if somewhat

"toothless" in application by the federal courts, *id.* at 782-83, the Court

---

[40] Even before *Associated Industries of Kentucky,* Kentucky courts recognized the right of the legislature "to delegate to executive officers the power to determine some fact upon which the act of the Legislature made or intended to make its own action to depend." *Comm. ex rel Meredith v. Johnson,* 166 S.W.2d 409, 415 (Ky. 1942) (upholding statute that conferred upon the Governor the power to determine whether an emergency exists and then upon such determination make expenditures from a fund appropriated for that purpose). *See also Ashland Transfer Co. v. State Tax Comm.,* 56 S.W.2d 691, 697 (Ky. 1932) (upholding statute allowing highway commission and county judges to reduce load and speed limits for trucks or prohibit them altogether when necessary to prevent damage to roads "in order to protect the public safety and convenience").

reviewed several Kentucky cases wherein a delegation of legislative authority was deemed unlawful because the "powers were granted without 'legislative criteria,'" *Miller v. Covington Dev. Auth.*, 539 S.W.2d 1, 4-5 (Ky. 1976), or the delegation lacked "standards controlling the exercise of administrative discretion," *Legislative Research Comm'n v. Brown*, 664 S.W.2d 907, 915 (Ky. 1984). The "unintelligible" legislative pension statute at issue in *Judicial Form Retirement* failed for those reasons–lack of "an intelligible principle" and the absence of any "standards controlling the exercise of administrative discretion." 132 S.W.3d at 785.

In the case before us, the intelligible principle enunciated by the General Assembly and the legislative criteria pertinent to the use of emergency powers are set forth in KRS 39A.010 quoted above. In the event of any of those multitude of threats, the Governor (and the Division of Emergency Management and local emergency agencies) are authorized to take action "to protect life and property of the people of the Commonwealth, and to protect public peace, health, safety and welfare . . . and in order to ensure the continuity and effectiveness of government in time of emergency, disaster or catastrophe . . . ." In KRS 39A.100(1), the Governor is granted twelve enumerated "emergency powers" including in subsection (j) the following: "Except as prohibited by this section or other law, to perform and exercise other functions, powers, and duties deemed necessary to promote and secure the safety and protection of the civilian population." Given the wide variance of occurrences that can

51

constitute an emergency, disaster or catastrophe, the criteria are necessarily broad and result-oriented, "protect life and property . . . and . . . public . . . health," KRS 39A.010, allowing the Governor working with the executive branch and emergency management agencies to determine what is necessary for the specific crisis at hand. Floods, tornadoes and ice storms require different responses than threats from nuclear, chemical or biological agents or biological, etiological, or radiological hazards but the emergency powers are always limited by the legislative criteria, i.e., they must be exercised in the context of a declared state of emergency, KRS 39A.100(1); designed to protect life, property, health and safety and to secure the continuity and effectiveness of government, KRS 39A.010; and exercised "to promote and secure the safety and protection of the civilian population." KRS 39A.100(1)(j).

In addition, KRS Chapter 39A contains procedural safeguards to prevent abuses. All written orders and administrative regulations promulgated by the Governor "shall have the full force of law" upon the filing of a copy with the Legislative Research Commission. KRS 39A.180(2).[41] This provides the

---

[41] Plaintiffs and the Attorney General object that the Governor has suspended laws in violation of Section 15 of the Kentucky Constitution: "No power to suspend laws shall be exercised unless by the General Assembly or its authority." They insist that suspensions are by their nature temporary and if an emergency continues at length, as in the present COVID-19 pandemic, the prolonged suspension of laws is invalid. However, the Governor is not suspending laws. His declaration of a state of emergency triggers his authority under KRS 39A.090 to "make, amend, and rescind any executive orders as deemed necessary" to carry out his responsibilities. The legislature has in KRS 39A.180(2) provided that all "existing laws, ordinances, and administrative regulations" that are inconsistent with KRS Chapters 39A to 39F or with the orders or administrative regulations issued under the authority of those KRS chapters "shall be suspended during the period of time and to the extent that the conflict exists." Thus, the General Assembly, not the Governor, has suspended the

requisite public notice. The duration of the state of emergency, at least the one at issue in this case, is also limited by the aforementioned 2020 Senate Bill 150, Section 3, which requires the Governor to state when the emergency has ceased but, in any event, allows the General Assembly to make the determination itself if the Governor has not declared an end to the emergency "before the first day of the next regular session of the General Assembly." The enunciation of criteria for use of the emergency powers, the timely, public notice provided for all orders and regulations promulgated by the Governor and the time limit on the duration of the emergency and accompanying powers all combine to render KRS Chapter 39A constitutional to the extent legislative powers are delegated.

Recently the Michigan Supreme Court, in a sharply divided opinion, addressed two certified questions posed by the federal district court regarding the Michigan Governor's exercise of emergency powers under that state's Emergency Management Act of 1976 (EMA) and Emergency Powers of the Governor Act of 1945 (EPGA). *In re Certified Questions From United States Dist. Court, W. Dist. of Michigan, S. Div.*, ___ N.W.2d ___, No. 161492, 2020 WL 5877599 (Mich. Oct. 2, 2020). The EPGA gave the Governor power, indefinite in duration, to declare an emergency and issue "reasonable orders, rules, and regulations as he or she considers necessary to protect life and property or to

---

laws. The statute has no time limitations on the length of the suspension and we will not read in one that prohibits "prolonged" emergencies.

53

bring the emergency situation within the affected area under control." MCL[42] 10.31(1). The majority concluded the "reasonable" and "necessary" standard failed to provide sufficient guidance to the Governor regarding the exercise of her powers and failed to constrain her actions "in any meaningful manner." *Certified Questions*, 2020 WL 5877599, at *17.

Finding the power delegated to be "of immense breadth and . . . devoid of all temporal limitations," *id.* at *18, the majority struck the statute as an unlawful delegation of legislative power to the executive branch violative of the Michigan Constitution's separation of powers provision. Chief Justice McCormack, writing for the three-justice minority, observed that the majority departed from one part of their longstanding test for delegation of legislative power, namely that "the standard must be as reasonably precise as the subject matter requires or permits." *Id.* at *41. Citing *Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2130 (2019), for the proposition that delegations of such authority must give the delegee "the flexibility to deal with real-world constraints," she noted that "given the unpredictability and range of emergencies the Legislature identified in the statute, it is difficult to see how it could have been more specific." *Id.* at *42.

Our case differs from the Michigan case in several important ways but most notably our Governor does not have emergency powers of indefinite duration, 2020 S.B. 150, § 3, and our legislature is not continuously in

___

[42] Michigan Compiled Laws.

session, ready to accept the handoff of responsibility for providing the government's response to an emergency such as the current global pandemic.[43] Moreover, with the breadth of potential emergencies identified in KRS 39A.010, the standards of protection of life, property, peace, health, safety and welfare (along with the "necessary" qualifier in KRS 39A.100(j)) are sufficiently specific to guide discretion while appropriately flexible to address a myriad of real-world events. While the authority exercised by the Governor in accordance with KRS Chapter 39A is necessarily broad, the checks on that authority are the same as those identified in Chief Justice McCormack's dissenting opinion: judicial challenges to the existence of an emergency or to the content of a particular order or regulation; legislative amendment or revocation of the emergency powers granted the Governor; and finally the "ultimate check" of citizens holding the Governor accountable at the ballot box. *Id.* at \*40.

Whatever import the principle of properly delegated legislative authority has in the ordinary workings of government, its import increases dramatically in the event of a statewide emergency in our Commonwealth. A legislature that is not in continuous session and without constitutional authority to convene itself cannot realistically manage a crisis on a day-to-day basis by the adoption and amendment of laws.[44] In any event, we decline to abandon approximately

---

[43] *See* n.36. Also, our Constitution does not allow the General Assembly to convene itself in extraordinary session, that power resting solely in the Governor pursuant to Section 80.

[44] The *amicus curiae* President of the Senate appears not to have advocated the same strict separation of powers, nondelegation position that the Attorney General advances. The *amicus curiae* brief defines the sole issue presented by this case as: "Did the Governor exceed the scope of the authority that the General Assembly

55

sixty years of precedent that appropriately channels and limits the delegation of legislative power in Kentucky. Applying that delegation precedent, KRS Chapter 39A passes muster as a constitutional delegation of power to the extent any of the powers accorded to and exercised by the Governor are in fact legislative.

In sum, the powers exercised by a Kentucky Governor in an emergency are likely executive powers in the first instance given provisions of our Kentucky Constitution, but to the extent those powers are seen as impinging on the legislative domain, our General Assembly has wisely addressed the situation in KRS Chapter 39A. That vital and often-used statutory scheme validly delegates any legislative authority at issue to the Governor with safeguards and criteria sufficient to pass constitutional muster.

## III. KRS Chapter 13A Does Not Limit the Governor's Authority to Act Under the Constitution and KRS Chapter 39A in the Event of an Emergency.

KRS Chapter 13A, "Administrative Regulations," provides for the promulgation of administrative regulations–defined in relevant part as a "statement of general applicability . . . that implements, interprets, or prescribes law or policy," KRS 13A.010(2)–both in the ordinary course of state government, KRS 13A.120, and in the event of an emergency, KRS 13A.190.

---

provided to him in KRS Chapter 39A by issuing his executive orders declaring an emergency as a result of the novel coronavirus pandemic (COVID-19)?" The brief focuses on the definition of "emergency" and need to consult local authorities. The *amicus* also notes the legislature's readiness to act if called into extraordinary session pursuant to Section 80 "[i]f the Governor feels that existing laws do not provide him with the tools needed to address COVID-19."

Plaintiffs and the Attorney General challenge the executive orders and regulations issued by the Governor as violative of KRS Chapter 13A. The Governor maintains that KRS Chapter 39A by its plain terms controls in a declared emergency, granting him the authority he has exercised but that if any conflict is perceived then the more specific statutory enactment pertaining to emergencies prevails. The plain language of the statutes supports the Governor's position. *Rothstein,* 532 S.W.3d at 648.

KRS 39A.100 recognizes the authority of the Governor to declare an emergency and exercise the enumerated emergency powers. In furtherance of that authority, KRS 39A.090 provides that "[t]he Governor may make, amend, and rescind any executive orders as deemed necessary to carry out the provisions of KRS Chapters 39A to 39F." Nothing in the plain words used requires consideration of KRS Chapter 13A or even requires promulgation of regulations; the Governor can choose to act solely through executive orders. The Governor may also promulgate regulations, however, as authorized by KRS 39A.180:

> (2) All written orders and administrative regulations promulgated by the Governor, the director, or by any political subdivision or other agency authorized by KRS Chapters 39A to 39F to make orders and promulgate administrative regulations, shall have the full force of law, when, if issued by the Governor, the director, or any state agency, a copy is filed with the Legislative Research Commission, or, if promulgated by an agency or political subdivision of the state, when filed in the office of the clerk of that political subdivision or agency. **All existing laws, ordinances, and administrative regulations inconsistent with the provisions of KRS Chapters 39A to 39F, or of any order or administrative regulation issued under the authority of KRS Chapters 39A**

57

**to 39F, shall be suspended during the period of time and to the extent that the conflict exists.**

(Emphasis added.) This statute plainly provides that the orders and regulations issued pursuant to the emergency authority granted the Governor in KRS Chapter 39A "shall have full force of law" upon filing with the Legislative Research Commission (LRC), the same entity that compiles, publishes and distributes administrative regulations generally. KRS 13A.050. To the extent KRS Chapter 13A contains anything "inconsistent" with either Chapter 39A or an order or regulation issued under the authority of that chapter then the General Assembly has expressly directed that it "shall be suspended during the period of time and to the extent that the conflict exists." KRS 39A.180(2). In short, while a state of emergency prevails the Governor can issue executive orders he or she "deem[s] necessary," KRS 39A.090, and can also choose to promulgate regulations, all of which become effective upon filing with the LRC.[45]

Simply put, the issue of reconciling KRS Chapter 39A with Chapter 13A to the extent they are inconsistent never arises because the General Assembly has given clear, unambiguous direction: KRS Chapter 39A controls over all laws to the contrary. To the extent the Plaintiffs and the Attorney General raise

---

[45] KRS Chapter 13A allows for the promulgation of "emergency administrative regulations," when necessary to "meet an imminent threat to public health, safety, or welfare" or "protect human health and the environment." KRS 13A.190(1). Those emergency regulations "shall become effective and shall be considered adopted" upon filing with the LRC. KRS 13A.190(2). Thus, KRS 39A.180(2) is consistent with the emergency administrative regulations provision in KRS Chapter 13A.

procedural due process concerns of public notice and public comment[46] with respect to the issuance of executive orders and promulgation of regulations pursuant to KRS Chapter 39A, those concerns have been adequately addressed. Public notice of all orders and regulations has been provided through the Governor's websites, https://govstatus.egov.com/ky-healthy-at-work and https://govstatus.egov.com/kycovid19. Public notice of the executive orders is also given in the Executive Journal available online through the Secretary of State, https://www.sos.ky.gov/admin/Executive/ExecJournal/Pages. Additionally, the emergency regulations are available on the legislature's website, https://legislature.ky.gov/Law/kar/Pages/EmergencyRegs.aspx. As for public input, the Healthy at Work website has a portal that allows industry groups, trade associations and individual businesses "to submit reopening proposals" and to discuss "strategies and challenges they face in safely reopening." Thus, opportunity for public comment exists and public notice is virtually instantaneous, with all orders and regulations easily accessible online.

In insisting that the Governor must use the regulatory process to affect private rights, the Attorney General emphasizes our statement in *Bowling v. Department of Corrections*, 301 S.W.3d 478, 491-92 (Ky. 2009): "Regulation is

---

[46] KRS 13A.190 does not provide an opportunity for public comment on emergency regulations, which are temporary in nature, just as the Governor's emergency orders and regulations are temporary.

59

. . . mandated by KRS 13A.100, which requires regulation if, as here, the regulation will prescribe statements of general applicability which implement laws . . . or affect private rights." Missing from this argument is any recognition that no state of emergency existed in *Bowling*, but, more importantly, any acknowledgement of the General Assembly's specific directive in KRS 39A.180(2) that inconsistent laws, ordinances and regulations are suspended by KRS Chapter 39A and the executive orders and regulations issued pursuant thereto. We find nothing strange about the legislature giving the Governor flexibility in the event of an emergency to act through either executive orders or regulations, the former being more suited to immediate response in the acute state of an emergency. In any event, both the childcare COVID-19 restrictions and the face mask requirement have been promulgated as emergency regulations.

In short, the General Assembly has answered this argument for us. KRS 39A.180(2) suspends any inconsistent laws. To the extent KRS Chapter 13A requires more than KRS Chapter 39A, the regular process applicable to administrative regulations has been displaced.

## IV. The Specifically Challenged Orders and Regulations Are Not Arbitrary Under Sections 1 and 2 of the Kentucky Constitution with One Limited Exception No Longer Applicable.

Plaintiffs and the Attorney General both contend that the Governor's challenged orders and two emergency regulations violate Sections 1 and 2 of the Kentucky Constitution. Section 1 provides that "[a]ll men are, by nature, free and equal, and have certain inherent and inalienable rights" including

60

"[t]he right of acquiring and protecting property." Section 2 states: "Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority." "Section 2 is broad enough to embrace the traditional concepts of both due process of law and equal protection of the law." *Kentucky Milk Mktg. & Antimonopoly Comm'n v. Kroger Co.*, 691 S.W.2d 893, 899 (Ky. 1985) (citing *Pritchett v. Marshall*, 375 S.W.2d 253, 258 (Ky. 1963)). Unlike the previously discussed legal arguments which are comprehensive attacks on all of the executive orders and regulations, this constitutional argument requires consideration of each order or regulation on an individual basis. The first consideration is the appropriate standard of review.

Strict scrutiny applies to a statute challenged on equal protection grounds if the classification used adversely impacts a fundamental right or liberty explicitly or implicitly protected by the Constitution or discriminates based upon a suspect class such as race, national origin, or alienage. *Steven Lee Enters. v. Varney*, 36 S.W.3d 391, 394 (Ky. 2000); *Clark v. Jeter*, 486 U.S. 456, 461 (1988); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). To survive strict scrutiny, the government must prove that the challenged action furthers a compelling governmental interest and is narrowly tailored to that interest. *D.F. v. Codell*, 127 S.W.3d 571, 575 (Ky. 2003) (citing *Varney*, 36 S.W.3d at 394); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Intermediate scrutiny, seldomly used, is generally used for discrimination based on gender or illegitimacy. *Codell*, 127 S.W.3d at 575–76;

61

*Varney,* 36 S.W.3d at 394.  Under this standard, the government must prove its action is substantially related to a legitimate state interest.  *Id.* (citing *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 441 (1985)).  Rational basis scrutiny is used for laws not subject to strict or intermediate scrutiny.  Under this deferential standard, the challenger has the burden of proving that the law is not rationally related to a legitimate government purpose.  *Hunter v. Commonwealth*, 587 S.W.3d 298, 304 (Ky. 2019).  Pertinent to this case, "[w]hen economic and business rights are involved, rather than fundamental rights, substantive due process requires that a statute be rationally related to a legitimate state objective."  *Stephens v. State Farm Mut. Auto. Ins. Co.*, 894 S.W.2d 624, 627 (Ky. 1995).

Plaintiffs and the Attorney General both assert that the Governor's orders have arbitrarily invaded the fundamental right of acquiring and protecting property guaranteed under Section 1 of the Kentucky Constitution.  Although they advance a "fundamental right" argument that would dictate strict scrutiny analysis, they offer no precedent.  Indeed, property rights, while enumerated in the Kentucky Constitution, have never been regarded as fundamental rights impervious to any impingement by the state except for restrictions that can pass strict scrutiny.  As the United States Supreme Court stated in *Nebbia v. New York*, 291 U.S. 502, 524, 527-28 (1934):

> These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in collision.

62

. . . .

The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited and the right to conduct a business, or to pursue a calling, may be conditioned.

In *Nourse v. City of Russellville*, 78 S.W.2d 761, 764 (Ky. 1935), this Court echoed that concept:

The right of property is a legal right and not a natural right, and it must be measured by reference to the rights of others and of the public. In *Mansbach Scrap Iron Co. v. City of Ashland*, 235 S.W.2d 968, 969 (Ky. 1930), we wrote: "The Bill of Rights grants no privileges. It conserves them subject, however, to the dominant rights of the people as a whole."

(Internal citation omitted.) Significantly, "[t]he conservation of public health should be of as much solicitude as the security of life. It is an imperative obligation of the state, and its fulfillment is through inherent powers." *Id.* Accordingly, as discussed below, Kentucky courts have always upheld restrictions on property rights that are reasonable, particularly in the all-important area of public health.

With no precedent for applying strict scrutiny, Plaintiffs and the Attorney General advocate intermediate scrutiny, but again Kentucky law does not support that heightened level of constitutional review. Addressing the case law they believe supportive of their position, we begin with *City of Louisville v. Kuhn*, 145 S.W.2d 851 (Ky. 1940), a case examining an ordinance that dictated the hours barbershops could be open for business. The Court began by noting the breadth of the police power exercised for the "public weal and for its betterment," which "if conditions demand it, would approve complete

63

prohibitive legislation of some activities, or in certain areas if based upon sufficient reasons." *Id.* at 853. Further, "whatever direction or phase that the legislation may take–whether of a prohibitory or regulatory character–it must not exceed or go beyond the limits of reasonability, or be rested upon assumed grounds for which there is no foundation in fact, nor may the legislation as enacted be more destructive of the interest of the public at large than beneficial." *Id.* In striking the barbershop ordinance, the Court concluded the restrictions were "unreasonable." *Id.* at 856. In short, while health reasons justified licensing barbers and certain restrictions, the hours of operation were not reasonably related to any legitimate governmental purpose.

Similarly, in *Adams, Inc. v. Louisville & Jefferson County Board of Health*, 439 S.W.2d 586 (Ky. 1969), apartment complex owners challenged an ordinance applicable to their private swimming pools. The Court succinctly observed: "There is perhaps no broader field of police power than that of public health. The fact that its exercise impinges upon private interests does not restrict reasonable regulation." *Id.* at 589-90.

> Under these conceptions of general subordination of private rights to public rights, we have no doubt that the city may enact laws to preserve and promote the health, morals, security, and general welfare of the citizens as a unit, and has a broad discretion in determining for itself what is harmful and inimical. It is sufficient if the municipal legislation has a real, substantial relation to the object to be accomplished, and its operation tends in some degree to prevent or suppress an offense, condition, or evil detrimental to a public good or reasonably necessary to secure public safety and welfare.
>
> The community is to be considered as a whole in the matter of preservation of the health of all inhabitants, for a failure by a

64

few to conform to sanitary measures may inflict ill health and death upon many.

*Id.* at 590 (quoting *Nourse*, 78 S.W.2d at 765).

The Court observed "while all swimming pools may present some common health hazards which would reasonably require the same regulatory safeguards, in certain areas the dissimilarity in prevailing conditions would make the application of a single standard inappropriate, unrealistic and unreasonable." *Id.* at 592. Given the nature of apartment complex swimming pools, the Court found the requirement of a lifeguard and pool attendant at all times, as well as shower facilities and separate gender-based entrances to be unreasonable. The Court struck part of the regulation but importantly for our purposes it stated, "insofar as public health is concerned, private property may become of public interest and the constitutional limitations upon the exercise of the power of regulation come down to a question of 'reasonability.'" *Id.* at 590 (citing *Kuhn*, 45 S.W.2d 851).

The other cases relied on by Plaintiffs and the Attorney General to insist intermediate scrutiny applies are similarly unavailing. In *Kentucky Milk Marketing*, 691 S.W.2d at 893, the Court found that the challenged statute was a minimum retail mark-up law applicable to milk and milk products, rather than an anti-monopoly law, and struck it as "inimical to the public interest . . . an invasion of the right of merchants to sell competitively, and of the public to buy competitively in the open market." *Id.* at 900. The Court began its Section 2 discussion by noting in part, "[t]he question of reasonableness is one of

65

degree and must be based on the facts of a particular case." *Id.* at 899.

*Kentucky Milk Marketing* involved no health and safety regulations, nor did it employ intermediate scrutiny.

In *Ware v. Ammon,* 278 S.W. 593 (Ky. 1925), a statute that prohibited any business from advertising as a dry-cleaning business without first obtaining a license from the state fire marshal was held unconstitutional as to a particular proprietor who offered pressing and repairs onsite but did not perform the actual dry cleaning on his business premises. The ordinance was premised on the health and safety issues posed by the presence of flammable, volatile substances used in dry cleaning and there being none on Mr. Ammons's premises the statute was "unreasonable and void" as to him and others similarly situated. *Id.* at 595. He could advertise as a dry cleaner. Again, the Court focused on whether the means adopted were "reasonably necessary to accomplish" the government's purpose and whether the law "impos[ed] unreasonable restrictions on a lawful occupation." *Id.*

A comprehensive review of Kentucky case law leaves no doubt that under Section 2 of our Constitution, laws and regulations directed to public health and safety are judged by their reasonableness. In *Graybeal v. McNevin*, 439 S.W.2d 323, 325-26 (Ky. 1969), a case involving fluoridation of a city's water supply, this Court stated:

> Among the police powers of government, the power to promote and safeguard the public health ranks at the top. If the right of an individual runs afoul of the exercise of this power, the right of the individual must yield.

66

> On the issue of arbitrariness, the burden was on the plaintiff to show that the regulation had **no reasonable basis in fact or had no reasonable relation to the protection of the public health.**

(Emphasis added.) In upholding the city's resolution to fluoridate its water pursuant to a state regulation, the *Graybeal* Court examined the credentials and testimony of both sides' witnesses at the bench trial and "the studies, tests, experiences, and recommendations of practically all the people and organizations into whose care the health of this nation has been entrusted" before concluding the plaintiff had "failed in his burden to prove the resolution was arbitrary." *Id.* at 331. The Court prefaced its holding that arbitrary exercises of public health powers are subject to judicial restraint but they "would have to be palpably so to justify a court in interfering with so salutary a power and one so necessary to the public health." *Id.* at 326. That principle has been reflected in our Kentucky case law for decades. *See, e.g., Lexington-Fayette Cty. Food & Bev. Ass'n v. Lexington-Fayette Urban Cty. Gov't*, 131 S.W.3d 745 (Ky. 2004) (upholding smoking ban as reasonable health regulation and noting public health interest is preferred over property interests).

Particularly apropos to the matter before us is the United States Supreme Court's decision in *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905), the case in which Massachusetts' mandatory vaccination law, enacted in the face of a growing smallpox epidemic, was challenged. Noting that "of paramount necessity, a community has the right to protect itself against an

67

epidemic of disease which threatens the safety of its members," the Supreme

Court held:

> [I]n every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by **reasonable** regulations, as the safety of the general public may demand.

*Id.* at 29 (emphasis added).  Just recently in the midst of the global COVID-19

pandemic, in *South Bay United Pentecostal Church v. Newsom*, __U.S.__, 140 S.

Ct. 1613, 1613-14 (Mem. 2020), Chief Justice John Roberts acknowledged the

broad latitude accorded executive action in times such as these:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson v. Massachusetts*, 197 U.S. 11, 38, 25 S.Ct. 358, 49 L.Ed. 643 (1905).  When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974).  Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people.  See *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

> That is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground.

Fully satisfied that the individual orders and regulations at issue in this

case are only deficient under Sections 1 and 2 of the Kentucky Constitution if

they are unreasonable–that is lack a rational basis[47]–we address only those individual orders and regulations that have been specifically challenged. Preliminarily, we note that by the time the Boone Circuit Court conducted an evidentiary hearing, some of the challenged restrictions had changed. Also, the trial court did not address the specific allegations of arbitrariness individually, but dealt with the claims as a whole stating, "[B]ased upon the disproportionate treatment meted out to different businesses versus that allowed for substantially similar activities,[48] the Court also finds Plaintiffs and Intervening Plaintiffs have made sufficient showing that the challenged orders violate Section 2 of the Kentucky Constitution as an attempt to exert '[a]bsolute and arbitrary power over the lives, liberty and property' of Kentucky citizens." Our analysis is focused, as it must be, on individual orders and regulations. And, we examine the record to determine whether Plaintiffs and the Attorney General have met their burden of showing the challenged orders and regulations lack a rational basis and thus are unconstitutional. *Johnson v. Comm. ex rel Meredith*, 165 S.W.2d 820, 823 (Ky. 1942) ("So, always the burden

---

[47] The Attorney General argues intermediate or heightened scrutiny is particularly appropriate here because the orders are the result of the Governor's judgment alone, rather than the legislature's after a bicameral process. He points to no authority for this proposition and we find none that dictates a more stringent standard than reasonableness/rational basis in these circumstances.

[48] The trial court Order states: "Plaintiffs insist that Defendants have presented no rational basis for the harshly disproportionate restrictions placed upon racetracks, daycares and cafes as compared to similarly situated activities such as baseball, auctions, and LDC's." It is not clear which standard of scrutiny the trial court used; the trial court also stated that "[I]t appears at this stage of the proceedings, that the challenged orders were neither constitutionally enacted nor narrowly tailored."

is upon one who questions the validity of an Act to sustain his contentions.");
*Hunter,* 587 S.W.3d at 304.

### A. Little Links's Allegations

Little Links's declaratory and injunctive action stems from the June 15, 2020 Healthy at Work: Requirements for Childcare.[49]  Center-based childcare programs, like Little Links, were closed on March 20, 2020.  To fill the childcare void for health care workers and first responders LDCs were permitted to open.  When center-based childcare programs were permitted to reopen on June 15, 2020, some regulations differed from the LDCs which were continuing to operate but were scheduled to be phased out by the end of August.  Thus, the center-based childcare programs and the LDCs' remaining operation period overlapped for about two and one-half months.

Little Links alleges three particular rules arbitrarily impose demands that are detrimental to survival of its business.  Little Links complains that in contrast to LDCs, all other childcare programs must utilize a maximum group size of ten children per group, a significant limitation on the business's ability to be profitable.  Rather than being limited to a specific maximum group size, the LDCs have capacity limitation of one child per thirty square feet.[50]  Second,

---

[49] The Governor's June 15, 2020 order incorporated the Healthy at Work requirements.  The Healthy at Work: Requirements for Childcare Programs addressed the requirements for in-home childcare programs, which opened June 8, and center-based childcare programs, which opened June 15.

[50] Pursuant to 922 KAR 2:120, for Kentucky childcare center premises typically, "[e]xclusive of the kitchen, bathroom, hallway, and storage area, there shall be a minimum of thirty-five (35) square feet of space per child."  When emphasizing the difference in the capacity limits for LDCs vis-a-vis regular childcare programs, the Attorney General misapplies the building restriction, noting one witness had a 43,500

70

LDCs do not have the restriction that children must remain in the same group of ten children all day without being combined with another classroom. Little Links views this rule as arbitrary, interpreting it to not allow children of the same household to be grouped in the evening despite the children leaving the center in the same vehicle. Lastly, because programs may not provide access to visitors after hours Little Links cannot conduct tours for prospective clients. Plaintiffs' witnesses testified about these disparities and the negative impact on a childcare facility's business viability.

Dr. Sarah Vanover, Director of Kentucky's Division of Childcare, testified about the rule creation for the LDCs and the June 15 reopening of the center-based childcare programs. As to the LDCs, when it became obvious that childcare centers were going to be closed, her office began the background research to put emergency licensure in place, contacting several coastal "hurricane" states to obtain copies of their emergency licenses and applications. At that time, many hospitals were looking at creating pop-up centers on site to make sure their employees had the childcare coverage that they needed, given many childcare options were no longer available. LDCs were created specifically to serve the needs of hospital staff and first responders. Given the understanding of the pandemic at the time childcare facilities closed, and the critical need to keep childcare available to essential

---

square foot playground, allowing 4,000 square feet per child "a limit untethered to science or reality" and hypothesizing that if it were an LDC it could serve well over 1,000 children. The childcare square footage limitation applies to buildings, not playgrounds.

employees, the LDCs were implemented using other states' emergency regulations as a guide. All centers which became LDCs were already a licensed type 1 center or certified program, meaning they already knew how childcare in Kentucky worked.

LDCs had fewer restrictions in order to open. Unlike the typical childcare regulations,[51] but like other states' emergency regulations, a specific maximum group size was not listed.[52] LDCs were required to have two adults present in each classroom and to divide children by age groups. Dr. Vanover testified that the many business closures at the time played a role in the adult to child ratio limitation. At the point LDCs opened, most businesses in the community were not open. Families using LDCs were leaving home, dropping a child off at childcare, going to work (as health care workers or first responders), and after work, picking up the child and going home. Consequently, the opportunity to contract the virus in different locations was very limited. Plus, many hospitals added their own restrictions, such as having their staff change out of their scrubs and into different clothes before picking their child up and entering the LDC to make sure that they were not spreading germs from the high-risk environment that they had been in. Dr. Vanover testified many LDCs

---

[51] Dr. Vanover explained ordinarily the maximum group size for preschool children is 28, with an adult to child ratio of 1 to 14.

[52] A memorandum from the Cabinet, Office of Inspector General, entered into evidence during Christine Fairfield's July 16, 2020 testimony stated that each LDC location should have 30 square feet per child.

added other restrictions to make sure that the children were staying healthy and safe.

Dr. Vanover explained that some LDCs were allowed to stay open past June 15 because the state was having difficulty making sure there would be enough care for all of the hospital staff's children when childcare centers reopened. No effort was made to revise the LDC requirements as the economy began to reopen because LDCs were phasing out at that point, with a planned expiration at the end of August.

Dr. Vanover testified that she helped to create the childcare reopening plan, performing background work in April and May. She and other state personnel participated in the Childcare Council of Kentucky's virtual meetings for childcare providers and advocates and heard questions and concerns of childcare center directors throughout the state; she visited LDCs to see procedures employed beyond those prescribed by the state; she contacted other states that had already opened or that never closed childcare, collecting information on what group sizes they used, what things had and had not been successful, and the relative spread of illness; and the Division of Childcare extensively reviewed CDC guidelines for childcare centers open during the pandemic to make sure that Kentucky followed the best health practices.

Dr. Vanover agreed that a CDC online document providing guidance for childcare programs that remain open did not expressly state that children

73

should be in small groups.[53]  She explained, however, that in multiple CDC phone calls for state administrators the CDC emphasized that having a smaller group size as well as having the children stay in those small groups was beneficial to the children.  Many states chose a group size of ten to see if it would be a small enough number to stop the virus spread, with the intent later to enlarge the number.  Kentucky followed that example in its reopening plan, and in an emergency regulation effective September 1, 2020 increased the child care group size to fifteen.  922 KAR 2:405E.

As to the requirement that children in different groups should not be combined, Dr. Vanover stated she knows of no public health reason that siblings should not be combined within the center at the end of the day.[54]  Dr. Stack testified similarly.  Dr. Vanover noted that the regulation applies to combining groups, it does not specifically address siblings.  Thus, this issue appears to be a misunderstanding of the regulation because it does not prohibit grouping siblings at the end of the day.[55]

---

[53] The CDC guidance was entered as an exhibit during the July 16, 2020 evidentiary hearing.  According to the supplemental guidance, it was updated April 21, 2020.

[54] Under normal regulations, age group combinations are restricted in that children under the age of two and above the age of two may be combined for a maximum of one hour per day, which is typically the first half hour of the day and the last half hour of the day based on the number of children left in the building.

[55] Witness Jennifer Washburn also described as problematic not being able to combine at the end of the day siblings who are in separate classes.  Neither Fairfield nor Washburn testified that a state official advised them they could not combine siblings at the end of the day.  Witness Bradley Stevenson testified that the primary concerns in the childcare industry at that point were the group size restriction of ten and being able to combine children before and after school.

Dr. Vanover also explained that in regard to the restriction on tours, with contact tracing in mind, the general idea was to restrict visitors to make sure that children and staff in the center had the minimal exposure possible to others who may have been exposed to the virus. Access was restricted to staff; children currently enrolled; those who would need legal access to the building, such as first responders; those needed for necessary repairs in the building; and therapeutic professionals. The plan was always to adjust going forward based upon the containment or spread of the virus. We note that effective September 1, 2020 childcare facilities were allowed to resume tours for prospective clients. 922 KAR 2:405E.

Dr. Stack also testified that because children are not always compliant, other interventions are necessary which reduce density, increase hygiene, and if disease were to spread, enable other methodologies to contain it quickly, such as cohorting and keeping smaller groups. Consequently, if one cohort of a group of ten has a problem, that does not necessitate shutting down the whole facility. As to not allowing siblings to be grouped at the beginning and end of the day, Dr. Stack stated that separating a family from itself is not one of the vehicles the state is using to reduce virus risk. He acknowledged that the LDC and childcare reopening group size rules were different because knowledge about COVID-19 evolved and the state environment was a different place in March when most people had to stay healthy at home as compared to June as the broader community reopened.

Plaintiffs point to the differences between LDCs and the reopened childcare program requirements, both of which are meant to keep children and staff safe, and argue that if the lesser requirements serve that function, more stringent requirements are arbitrary. However, the record reflects the two programs were developed under different circumstances with different foundations of evolving knowledge. The LDCs were literally emergency childcare for healthcare workers and first responders in the very early days of the pandemic with regulations based on successful emergency childcare centers in other states. LDCs were limited to children of essential workers at a time when society was generally closed down, continued providing care when it was unclear that sufficient childcare would be available without them and now have evolved to provide temporary emergency childcare for nontraditional instuction during traditional school hours. When regular Kentucky childcare facilities generally reopened in June 2020, the group sizes and the tour restrictions for these centers were based on articulated public health reasons, i.e., efforts to limit the spread of disease as society in general was reopening. These facilities reopened serving the general population at a time when the potential for disease spread had increased. Thus, Plaintiffs failed to meet their burden of establishing that either of these challenged childcare restrictions lack a reasonable basis, standing alone or in comparison with LDC regulations. On the contrary, the record amply reflects a rational basis for both of them. As for the grouping of siblings, as noted above, the regulation does not prevent siblings being grouped together at the end of the day.

**B. Florence Speedway's Allegations**

Next, Florence Speedway complains that the June 1, 2020 Healthy at Work: Requirements for Automobile Racing Tracks[56] contains arbitrary provisions, those being: (1) only allowing authorized employees and essential drivers and crews on the premises when indoor facilities like restaurants and bowling alleys are allowed 33% capacity; (2) limiting its food service to "carry-out only" when restaurants are permitted to operate at 33% capacity indoors; and (3) requiring PPE with no exceptions, which prevents it from complying with the Americans with Disabilities Act.[57]  Because this was at a time when it was not permitted to have fans, Florence Speedway indicated that it was willing to space spectators six feet from people of a different household.  By the time the Boone Circuit Court conducted an evidentiary hearing for the injunction request and issued its order, however, the requirements directly challenged had all changed.  When Florence Speedway amended its motion for a temporary injunction, it did not challenge the capacity requirement in effect but, as a business reliant on family attendance, objected to the social distancing requirement which did not allow household members to sit within six feet of one another.  Florence Speedway argued the six-foot social

---

[56] The Governor's June 3, 2020 order, incorporating the Healthy at Work requirements, made them effective June 1, 2020.

[57] The order actually provided: "Racetracks should ensure employees and racing crews wear appropriate face coverings at all times practicable . . . ."  The requirements state that for employees who are isolated with more than six feet of social distancing, face coverings are not necessary at all times.

77

distancing requirement was arbitrary as household members maintain close proximity to each other throughout everyday life.

As noted above, on June 22, 2020, the requirements for restaurants were amended, allowing an increase from 33% to 50% indoor dining capacity. On June 29, 2020, the public-facing businesses order was amended to allow venues and event spaces, including Florence Speedway, to reopen to the public.[58] The amendment allows 50% of the maximum capacity permitted at a venue, assuming all individuals can maintain six feet of space between them with that level of occupancy. Additionally, if the venues operate any form of dining service, those services must comply with the requirements for restaurants and bars. On July 10, 2020, the emergency mask regulation provided a number of exemptions for the wearing of face coverings, one exemption being for "[a]ny person with disability, or a physical or mental impairment, that prevents them from safely wearing a face covering."

---

[58] The Healthy at Work: Requirements for Venues and Event Spaces applied to, among other businesses, "professional and amateur sporting/athletic stadiums and arenas."

During the July 1, 2020 hearing of Plaintiffs' motion for a temporary restraining order, Governor's counsel explained that Florence Speedway's capacity complaint was moot because the June 29 Healthy at Work order allowed it to open at 50% capacity. In response to Florence Speedway's concern that a footnote in the order suggested differently, Governor's counsel clarified that Florence Speedway was able to open at 50% capacity and offered to amend the order to address Florence Speedway's concern. A revised order was issued, effective July 10, 2020. The July 10 order maintained the six-foot social distancing requirement for individuals. Florence Speedway, its business relying on family attendance, testified at the July 16 injunction hearing about the negative business impact of not being allowed to have family members sit within six feet of each other. Effective July 22, 2020, the social distancing requirement for venues and event spaces was amended to "[a]ll individuals in the venue or event space must be able to maintain six (6) feet of space from everyone who is not a member of their household."

78

Except for the claim related to the inability of household members to sit within six feet of one another, which we discuss further below, the succeeding orders made Florence Speedway's initial claims of arbitrariness moot by the time the trial court entered its July 20 order. Of course, one exception to the mootness doctrine is the "capable of repetition, yet evading review" exception. *Philpot v. Patton*, 837 S.W.2d 491, 493 (Ky. 1992). Under this exception, Kentucky courts consider "whether (1) the 'challenged action is too short in duration to be fully litigated prior to its cessation or expiration and (2) there is a reasonable expectation that the same complaining party would be subject to the same action again.'" *Id.* (quoting *In re Commerce Oil Co.*, 847 F.2d 291, 293 (6th Cir. 1988)). However, the Florence Speedway's claims of arbitrariness as to the June 1, 2020 Healthy at Work: Requirements for Automobile Racing Tracks do not meet the criteria for the "capable of repetition, yet evading review" exception. The nature of this case, a public health pandemic, is extraordinary and evolving knowledge of the virus results in evolving responses. Consequently, this is not the usual case of a challenged action being too short in duration to be fully litigated prior to its cessation or expiration. And given the advancement of knowledge of COVID-19 and the ongoing attempts to balance that knowledge with keeping the economy open, no reasonable expectation exists that Florence Speedway will again be subject to the initially challenged business restrictions. In terms of Florence Speedway's challenge against the social distancing requirement which did not

allow family members to sit within six feet of one another, we conclude that requirement was arbitrary.

During the July 16 hearing, Dr. Stack testified about the public health concerns related to sporting events. He said sporting events are particularly concerning because people are often shouting and cheering, which leads to an increased spread of the respiratory droplets that transmit the virus. This enhanced risk exists even outdoors due to the shouting and cheering. Also, eating and drinking increase saliva and spread respiratory droplets and consuming food and drink is not compatible with mask wearing. However, he agreed no medical or public health reason would prohibit household members sitting together at an event space and acknowledged that household seating had been permitted in other activities. Effective July 22, 2020, the social distancing requirement for venues and event spaces was amended to "[a]ll individuals in the venue or event space must be able to maintain six (6) feet of space from everyone who is not a member of their household." Based on Dr. Stack's testimony, we must conclude that there was not a rational basis for the social distancing requirement initially imposed on Florence Speedway. Given that the social distancing requirement was amended six days after the injunction hearing, Florence Speedway has now received the relief which it sought.

80

### C. Beans Cafe's Allegations

Beans Cafe originally sought a declaration that certain provisions of the May 22, 2020 Healthy at Work: Requirements for Restaurants[59] are arbitrary. It complained that the requirement that employees wear PPE whenever they are near other employees or customers (so long as such use does not jeopardize the employee's health or safety) is not uniformly applied. Beans Cafe also alleged little scientific basis exists for requiring cloth facemasks, rendering the requirement arbitrary. The cafe challenged as arbitrary and capricious the order limiting restaurants to 33% indoor capacity and requiring six feet of distance between customers, noting these requirements make it difficult, if not impossible, for restaurants to make a profit. Beans Cafe also contends that it is arbitrary not to allow customers to sit back-to-back at tables with a three-and-one-half foot distance between the customers.

As indicated above, effective June 29, 2020, in the Healthy at Work: Requirements for Restaurants and Bars, the social distancing requirements for restaurants changed to a 50% capacity limit or the greatest number that permits individuals not from the same household to maintain six feet of space between each other with that level of occupancy. The PPE mask provisions stayed the same. However, the emergency mask regulation went into effect July 10, 2020. Based on the changes in regulations, the only issues remaining are whether a rational basis exists for requiring the six-foot social distancing

---

[59] The Governor's May 22, 2020 order incorporated the Healthy at Work requirements.

81

and face coverings.  Beans Cafe seeks an amendment in the six-foot social distancing requirement because that requirement, despite being allowed 50% capacity, reduces the business's seating capacity to about 30%.

Although the July 10, 2020 emergency mask regulation is more detailed than the May 22, 2020 face mask provision, the requirement that employees must wear face masks when they are near other employees or customers (so long as such use does not jeopardize the employee's health or safety) is reflected in 902 KAR 2:190E[60] Section (2), subsections (2)(a) and (4)(b), which requires any person in a restaurant (when not seated and consuming food or beverage) to wear a face covering when within six feet of another, unless that individual is of his household; the face covering provision does not apply when a person has a disability that prevents them from safely wearing a face covering.  As identified in 902 KAR 2:190E, KRS 214.020, the Cabinet for Health and Family Services's broad police powers for dealing with contagious

---

[60] 902 KAR 2:210E replaced 902 KAR 2:190E effective August 7, 2020 at 5:00 p.m.  Related to this case, 902 KAR 2:210E changed the non-compliance penalties. The penalties are described below.

diseases,[61] KRS 211.025,[62] and KRS 211.180(1)[63] provide a rational basis for the face covering and the social distancing measure which Beans Cafe challenges. In addition, Dr. Stack testified during the evidentiary hearing regarding the scientific basis for the six-foot social distancing requirement and wearing face coverings to prevent the spread of COVID-19, a highly contagious respiratory disease. Beans Cafe's citation to a study questioning the efficacy of cloth masks does not in any way negate the established rational basis for these public health measures.[64]

---

[61] KRS 214.020 states:

When the Cabinet for Health and Family Services believes that there is a probability that any infectious or contagious disease will invade this state, it shall take such action and adopt and enforce such rules and regulations as it deems efficient in preventing the introduction or spread of such infectious or contagious disease or diseases within this state, and to accomplish these objects shall establish and strictly maintain quarantine and isolation at such places as it deems proper.

[62] KRS 211.025 states:

Except as otherwise provided by law, the cabinet shall administer all provisions of law relating to public health; shall enforce all public health laws and all regulations of the secretary; shall supervise and assist all local boards of health and departments; shall do all other things reasonably necessary to protect and improve the health of the people; and may cooperate with federal and other health agencies and organizations in matters relating to public health.

[63] KRS 211.180(1) states:

The cabinet shall enforce the administrative regulations promulgated by the secretary of the Cabinet for Health and Family Services for the regulation and control of the matters set out below . . . including but not limited to the following matters: (a) Detection, prevention, and control of communicable diseases, . . . .

[64] The Boone Circuit Court cited to the study but declined to rely on it as not being subject to judicial notice. The title of the study indicates it compared cloth masks to medical masks in healthcare workers.

In regard to Beans Cafe's allegation that it was arbitrary not to allow customers to sit back-to-back at tables with a three and one-half foot distance between them, Dr. Stack testified to the reasoning behind measures used in restaurants to mitigate spread of the virus. He first noted that eating and drinking increases saliva and spreads respiratory droplets because people do not wear masks while consuming food and drink. In terms of the six-foot spacing requirement for restaurant and bars, there is an exception for booth seating when there is a plexiglass barrier, as long as the barrier effectively separates the opposite side. The physical barrier is of added value and in theory prevents virus spreading easily back and forth. Dr. Stack contrasted that to the very different situation when people are sitting back-to-back with three-foot distance between them in the middle of an open restaurant, when people generally turn and move around, an environment where the virus can easily spread. On this restriction, Beans Cafe essentially had nothing more than an allegation of arbitrariness while Dr. Stack's testimony establishes a rational basis for this public health measure.

Finally, face masks. As this case progressed to the injunction hearing, Plaintiffs expressed that they were willing to require their employees and customers to wear masks, a fact noted by the Boone Circuit Court in its Order. However, they objected to the business closure penalty that could result if they did not enforce the mask requirement on their premises. Plaintiffs argue that the July 10, 2020 statewide mask regulation, 902 KAR 2:190E, which they

describe as requiring businesses in violation of the regulation to be immediately shut down, violates due process.

Pertinently, 902 KAR 2:190E Section 3, Non-Compliance, provides:

> (2) Any person who violates this Regulation by failing to wear a face covering while in a location listed in Section 2 and not subject to any of the listed exemptions shall receive a warning for the first offense, a fine of fifty dollars ($50) for the second offense, seventy five dollars for the third offense, and one hundred dollars for each subsequent offense.[65] Additionally, if the person is violating this Regulation by attempting to enter a public-facing entity or mode of transportation listed in Section 2 while failing to wear a face covering and not subject to any of the exemptions listed, they shall be denied access to that public-facing entity or mode of transportation. If a person is already on the premises and violates this Regulation by removing a face covering, they shall be denied services and asked to leave the premises, and may be subject to other applicable civil and criminal penalties.
> (3) Any owner, operator or employer of a business or other public facing entity who violates this Regulation by permitting individuals on the premises who are not wearing a

---

[65] 902 KAR 2:210E revised the penalty section to read:

A person who violates this administrative regulation by failing to wear a face covering as required by Section 2(2) of this administrative regulation and who is not exempt pursuant to Section 2(3) of this administrative regulation shall be given a warning for the first offense and shall be fined:
1. Twenty-five (25) dollars for the second offense;
2. Fifty (50) dollars for the third offense;
3. Seventy-five (75) dollars for the fourth offense; and
4. $100 for each subsequent offense.

At a September 8, 2020 meeting of the Administrative Regulation Review Subcommittee, the face mask regulation, 902 KAR 2:210E, was the subject of public comment by several witnesses. After the comments, a subcommittee member made a motion to declare the emergency regulation deficient. A deficiency motion is the vehicle the subcommittee uses to request that the Governor withdraw an emergency regulation in accordance with KRS 13A.190. The motion failed. *902 KAR 2:210E: Covering the Face in Response to Declared National Or State Public Health Emergency – Committee Review of Effective Regulations,* Admin. R. Review Subcomm. (Sept. 8, 2020) (minutes available at https://apps.legislature.ky.gov/minutes/adm_regs/200908OK.PDF).

face covering and are not subject to any exemption shall be fined at the rates listed in section 3(2). The business may also be subject to an order requiring immediate closure.

While the Plaintiffs argue that the closure penalty for non-compliance is arbitrary due to lack of procedural due process, they do not identify any among themselves who has been threatened with a fine, fined, threatened with closure, or closed pursuant to 902 KAR 2:190E. As recently explained in *Commonwealth Cabinet for Health & Family Services, Department for Medicaid Services v. Sexton by & through Appalachian Regional Healthcare, Inc.,* 566 S.W.3d 185, 195 (Ky. 2018), in order for Kentucky courts to have constitutional jurisdiction to decide a claim, the litigant must have standing. Standing is achieved when "[a] plaintiff . . . allege[s] a personal injury fairly traceable to the defendant's allegedly unlawful conduct and [which is] likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751 (1984), *overruled on other grounds* by *Lexmark Intern., Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014). The injury must be a distinct and palpable injury that is actual or imminent. *Id.* at 751; *Massachusetts v. EPA,* 549 U.S. 497, 517, 127 S. Ct. 1438, 1453 (2007) (citing *Lujan* v. *Defenders of Wildlife,* 504 U.S. 555, 578 (1992)). Here, because the Plaintiffs' injury is only hypothetical, they have failed to show the requisite injury for adjudication of their claim related to 902 KAR 2:190E's business closure penalty. Additionally, because the Plaintiffs have not raised a case or controversy, *Commonwealth v. Bredhold,* 599 S.W.3d 409, 417 (Ky. 2020), a declaration of rights is not available to the Plaintiffs under 902 KAR 2:190E. *See also* KRS 418.040; *Veith v. City of Louisville,* 355

S.W.2d 295 (Ky. 1962). Finally, while it is clear that the Cabinet has broad police powers to enforce its public health measures, Plaintiffs are not without recourse if they were to become subject to a fine or business closure and chose to challenge it. Just as in the present case, the courts are always open when citizens believe the government has overstepped.

Although not a challenge to a specific individual order or regulation, the Attorney General also has challenged the Governor's orders as arbitrary because they have not been geographically tailored on a county-by-county or regional basis, but have employed a "one-size-fits-all-approach." He notes, at least early on, some areas of Kentucky had no reported COVID-19 cases. However, given Dr. Stack's testimony about COVID-19's introduction and quick spread to the United States and evolving knowledge of its method of transmission, the Attorney General has failed to show how the Governor's orders dealing with a previously unknown viral pathogen were not rationally related to mitigation of its spread. In fact, COVID-19 has now spread to all 120 Kentucky counties and all areas of the Commonwealth even with prompt and proactive public health measures.[66]

In summary, KRS 214.020 reflects the Cabinet's broad police powers (and the Governor's in conjunction with the Cabinet in the event of an emergency) to adopt measures that will prevent the introduction and spread of infectious diseases in this state. While a global pandemic is unprecedented for

---

[66] *See* Kentucky Cabinet for Health and Family Services, *COVID-19 Daily Reports*, https://chfs.ky.gov/Pages/cvdaily.aspx (last visited Nov. 1, 2020).

all but those who were alive during the 1918 influenza epidemic,[67] the

measures employed to deal with the spread of COVID-19, including business

closure, are not unprecedented in our Commonwealth.  *See Allison v. Cash*,

137 S.W. 245 (Ky. 1911) (smallpox epidemic in Lyon County grounds for

closing millinery shop).  Courts have long recognized the broad health care

powers of the government will frequently affect and impinge on business and

individual interests.  As the United States Supreme Court recognized in

*Jacobson*, 197 U.S. at 26,

> But the liberty secured by the Constitution of the United States
> to every person within its jurisdiction does not import an
> absolute right in each person to be, at all times and in all
> circumstances, wholly freed from restraint.  There are manifold
> restraints to which every person is necessarily subject for the
> common good.  On any other basis organized society could not
> exist with safety to its members.  Society based on the rule that
> each one is a law unto himself would soon be confronted with
> disorder and anarchy.  Real liberty for all could not exist under
> the operation of a principle which recognizes the right of each
> individual person to use his own, whether in respect of his
> person or his property, regardless of the injury that may be
> done to others.

Here, except for the initial social distancing requirement at Florence

Speedway which violates Section 2, the challenged public health measures do

---

[67] University of Michigan Center for the History of Medicine, *American Influenza Epidemic of 1918-1919: Louisville, Kentucky*, https://www.influenzaarchive.org /cities/city-louisville.html#.  The influenza death toll in Kentucky during that epidemic is estimated between 14,000-16,000.  Worldwide it is estimated that at least 50 million died, with about 675,000 deaths occurring in the United States.  Jack Welch, *The Mother of All Pandemics*, Louisville Magazine (Aug. 16, 2020, 11:03 a.m., originally appeared in Oct. 2009 issue), https://www.louisville.com/content/mother-all-pandemics; Centers for Disease Control and Prevention, *1918 Pandemic (H1N1 virus)*, https://www.cdc.gov/flu/pandemic-resources/1918-pandemic-h1n1.html. (Sources last visited Nov. 1, 2020.)

not violate Sections 1 and 2 of the Kentucky Constitution. A rational basis exists for the other orders and regulations, all of which are reasonably designed to contain the spread of a highly contagious and potentially deadly disease. As to Florence Speedway, its social distancing complaint regarding household seating has been remedied with a subsequent executive order that became effective six days after the July 16 injunction hearing.

## V. The Writ Action is Moot and Plaintiffs Have Not Established that They Are Entitled to the Requested Injunctive Relief.

This particular action, 2020-SC-0313, began as an original action seeking a writ against the Court of Appeals' judge who had denied writ relief following the issuance of the Boone Circuit Court's July 2, 2020 restraining order. Typically a restraining order remains in place until and not after (a) the time set for a hearing on a motion to dissolve the order, (b) entry of a temporary injunction or (c) entry of final judgment. CR 65.03. A hearing was held on Plaintiffs' and the Attorney General's request for a temporary injunction and the Boone Circuit Court prepared a July 20, 2020 temporary injunction order, granting the relief requested, but our July 17 stay order precluded entry of any such order until this Court addressed the COVID-19 emergency issues raised in that and other pending cases. With the presentation of a temporary injunction ready for entry, the writ action as presented is now moot and by virtue of this Court's stay order this case has essentially evolved into an appeal of the temporary injunction order.

A temporary injunction may be issued by the trial court when the plaintiff has shown irreparable injury, that the various equities involved favor

issuance of the relief requested and that a substantial question exists on the merits. *Maupin v. Stansbury,* 575 S.W.2d 695, 697 (Ky. App. 1978). "Although not an exclusive list, [in balancing the equities] the court should consider such things as possible detriment to the public interest, harm to the defendant, and whether the injunction will merely preserve the status quo." *Id.* To grant relief, a trial court must conclude "that an injunction will not be inequitable, *i.e.,* will not unduly harm other parties or disserve the public." *Price v. Paintsville Tourism Comm'n,* 261 S.W.3d 482, 484 (Ky. 2008). To satisfy the "substantial question" prong of the temporary injunction analysis, the trial court must determine there is a "**substantial possibility**" that the plaintiff "will ultimately prevail on the merits." *Norsworthy v. Kentucky Bd. of Medical Licensure,* 330 S.W.3d 58, 63 (Ky. 2009) (emphasis added). A trial court's order granting injunctive relief is reviewed for abuse of discretion. *Price,* 261 S.W.3d at 484. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

Here, the trial court concluded that at least two of the Plaintiffs, Little Links and Florence Speedway, had established irreparable injury to their respective business interests. Even if we accept those findings for purposes of review, injunctive relief is still not justified in this case. As our discussion of the four legal challenges reflects, there is not a "substantial possibility" that Plaintiffs and the Attorney General "will ultimately prevail on the merits."

90

*Norsworthy,* 330 S.W.3d at 63. Additionally, the equities weigh against the grant of a temporary injunction.

Plaintiffs and the Attorney General argue that the injunction serves the public interest because the Governor's orders have caused economic hardships and burdened the constitutional rights of citizens. In their view, the injunction will allow Kentuckians to reestablish control over critical aspects of their lives. We conclude that the greater public interest lies instead with the public health of the citizens of the Commonwealth as a whole. The global COVID-19 pandemic threatens not only the health and lives of Kentuckians but also their own economic interests; the interests of the vast majority take precedence over the individual business interests of any one person or entity. While we recognize and appreciate that the Plaintiffs allege injuries to entire industries in the state, such as the restaurant and childcare industries, the interests of these industries simply cannot outweigh the public health interests of the state as a whole.

The Governor's orders were, and continue to be, necessary to slow the spread of COVID-19 and protect the health and safety of all Kentucky citizens. This type of highly contagious etiological hazard is precisely the type of emergency that requires a statewide response and properly serves as a basis for the Governor's actions under KRS Chapter 39A. Because the law and equities favor the Governor in this matter, it was an abuse of discretion for the trial court to issue the temporary injunction.

91

## CONCLUSION

Upon finality of this Opinion, the stay entered July 17, 2020 shall be lifted as to any affected cases challenging the Governor's COVID-19 response and those cases may proceed consistent with this Opinion. As to the Boone Circuit Court litigation, the July 20, 2020 Order that has been held in abeyance is reversed and this matter is remanded to that Court for further proceedings, if any, consistent with this Opinion.

All sitting. All concur.

COUNSEL FOR PETITIONER,
HONORABLE ANDREW BESHEAR,
IN HIS OFFICIAL CAPACITY AS
GOVERNOR:

Steven Travis Mayo
La Tasha Arnae Buckner
Samuel Robert Flynn
Joseph Anthony Newberg
Taylor Allen Payne
Laura Crittenden Tipton
Office of the Governor

COUNSEL FOR PETITIONERS,
ERIC FRIEDLANDER, IN HIS
OFFICIAL CAPACITY AS SECRETARY
OF THE KENTUCKY CABINET FOR
HEALTH AND FAMILY SERVICES; DR.
STEVEN STACK, IN HIS OFFICIAL
CAPACITY AS COMMISSIONER OF THE
KENTUCKY DEPARTMENT FOR PUBLIC
HEALTH; THE KENTUCKY CABINET FOR
HEALTH AND FAMILY SERVICES; AND
THE KENTUCKY DEPARTMENT FOR
PUBLIC HEALTH:

Wesley Warden Duke
David Thomas Lovely
Cabinet for Health and Family Services
Office of Legal Services

COUNSEL FOR REAL PARTIES
IN INTEREST, FLORENCE SPEEDWAY,
INC.; RIDGEWAY PROPERTIES, LLC,
D/B/A BEANS CAFE & BAKERY; AND
LITTLE LINKS LEARNING, LLC:

Christopher David Wiest

COUNSEL FOR REAL PARTY IN
INTEREST, HONORABLE DANIEL J.
CAMERON, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL:

Heather Lynn Becker
Barry Lee Dunn
Marc Edwin Manley
Stephen Chad Meredith
Brett Robert Nolan
Aaron John Silletto
Office of the Attorney General

COUNSEL FOR AMICUS CURIAE,
ROBERT STIVERS, IN HIS OFFICIAL
CAPACITY AS PRESIDENT OF THE
KENTUCKY SENATE:

David Earl Fleenor
Office of the Senate President

# APPENDIX A

## Declarations of Emergency from 1996 to present

| Date:* | Order Number: | Related to: |
|---|---|---|
| 1.  1/8/1996 | 1996-0037 | Severe winter storms |
| 2.  3/21/1996 | 1996-0359 | Severe winter storms |
| 3.  4/22/1996 | 1996-0501 | Heavy rainfall and storms |
| 4.  5/30/1996 | 1996-0689 | Severe weather tornadoes |
| 5.  7/23/1996 | 1996-0970 | Active Duty Order – severe weather |
| 6.  3/3/1997 | 1997-0267 | Severe storms and record rainfall |
| 7.  12/10/1997 | 1997-1610 | Active Duty Order – severe winter storms Monroe County |
| 8.  2/10/1998 | 1998-0159 | Winter storm |
| 9.  2/18/1998 | 1998-0189 | Winter storm |
| 10. 7/30/1998 | 1998-1014 | Threat to public health water contamination in Auburn |
| 11. 9/16/1998 | 1998-1252 | Threat to public health water contamination in Logan County |
| 12. 9/16/1998 | 1998-1268 | Sawdust fire |
| 13. 9/17/1998 | 1998-1159 | Critical need for hay due to drought |
| 14. 8/20/1999 | 1999-1159 | Severe drought and fire season |
| 15. 10/11/1999 | 1999-1377 | Failure of water treatment system |
| 16. 11/18/1999 | 1999-1542 | Contaminated water |
| 17. 1/5/2000 | 1998-0012 | Severe weather |
| 18. 1/26/2000 | 2000-0019 | Ohio County water tank failure |
| 19. 2/21/2000 | 2000-0245 | Severe thunderstorms |
| 20. 5/11/2000 | 2000-0563 | Menifee Co. & Frenchburg water loss from storage tanks |
| 21. 5/30/2000 | 2000-0620 | Grayson County severe storms |
| 22. 10/16/2000 | 2000-1347 | Water contamination |
| 23. 11/6/2000 | 2000-1427 | Forest fires |
| 24. 12/14/2000 | 2000-1582 | Collapse of water tank in Pineville |
| 25. 1/22/2000 | 2000-0085 | Vicco water tank failure |
| 26. 6/4/2001 | 2001-0683 | Laurel County storm damage |
| 27. 6/12/2001 | 2001-0718 | Rockport water plant failure |
| 28. 8/7/2001 | 2001-0996 | Severe storms |
| 29. 8/20/2001 | 2001-1059 | Severe storms |
| 30. 9/5/2001 | 2001-1137 | Dixon water line leakage |
| 31. 9/5/2001 | 2001-1138 | Elkhorn flooding |
| 32. 9/21/2001 | 2001-1139 | Changing weight limits for trucks due to petroleum shortage |
| 33. 11/2/2001 | 2001-1361 | Fire danger due to wind and drought |
| 34. 2/1/2002 | 2002-0133 | Severe storms and tornadoes+ |

| Date:* | Order Number: | Related to: |
|---|---|---|
| **35.** 2/1/2002 | 2002-0134 | Water supply shortages |
| **36.** 3/21/2002 | 2002-0326 | Heavy rainfall, flooding, and power outages |
| **37.** 4/29/2002 | 2002-0483 | Severe storms and tornadoes |
| **38.** 6/18/2002 | 2002-0686 | Authorizing combining the Natural Resources and Environmental Protection Cabinet and the Department of Military Affairs during a state of emergency |
| **39.** 6/18/2002 | 2002-0687 | Authorizing combining resources of the Kentucky National Guard and other state agencies during a state of emergency |
| **40.** 6/18/2002 | 2002-0688 | Authorizing support of the Kentucky National Guard |
| **41.** 6/18/2002 | 2002-0689 | Authorizing combining the Kentucky National Guard and other agencies in preparation for a seismic disaster |
| **42.** 6/18/2002 | 2002-0690 | Authorizing combining the Kentucky National Guard and the Division of Forestry in preparation for forest fires |
| **43.** 6/18/2002 | 2002-0691 | Authorizing the Kentucky National Guard to work on anti-drug operations |
| **44.** 12/6/2002 | 2002-1343 | Dangerous levels of Manganese in the Hawesville water supply |
| **45.** 2/16/2003 | 2003-0150 | Winter storm |
| **46.** 3/25/2003 | 2003-0284 | Flood damage in Murray |
| **47.** 5/13/2003 | 2003-0459 | Severe storms |
| **48.** 6/19/2003 | 2003-0617 | Severe storms |
| **49.** 8/26/2003 | 2003-0875 | Severe storms |
| **50.** 5/28/2004 | 2004-0536 | Strong spring storms in Central Kentucky – tornadoes, flooding, heavy rainfall |
| **51.** 7/20/2004 | 2004-0780 | Severe thunderstorms in Central Kentucky |
| **52.** 9/16/2004 | 2004-1019 | Remnants of Hurricane Ivan moving into Kentucky |
| **53.** 12/23/2004 | 2004-1368 | Winter storm; heavy snow and ice, freezing rain |
| **54.** 12/29/2004 | 2004-1371 | Winter storm |
| **55.** 8/30/2005 | 2005-0927 | Remnants of Hurricane Katrina moving across Kentucky |
| **56.** 11/7/2005 | 2005-1230 | Extreme fall storms in Western Kentucky |
| **57.** 11/16/2005 | 2005-1255 | Extreme fall storms in Western Kentucky |
| **58.** 12/21/2005 | 2005-1368 | Winter storms across Kentucky |
| **59.** 1/4/2006 | 2006-0006 | Severe storms across Kentucky |
| **60.** 4/3/2006 | 2006-0361 | Severe weather; power outages across Kentucky |
| **61.** 9/29/2006 | 2006-1250 | Extreme fall storms across Kentucky |

| Date:* | Order Number: | Related to: |
|---|---|---|
| **62.** 1/17/2007 | 2007-0063 | Train derailment in Bullitt County; state of emergency applies to entire Commonwealth |
| **63.** 2/28/2007 | 2007-0179 | Water emergency in Knott County and City of Hindman |
| **64.** 4/9/2007 | 2007-0291 | Additional funding required for Kentucky State Police |
| **65.** 4/13/2007 | 2007-0298 | Threat of failure of the Wolf Creek Dam |
| **66.** 4/25/2007 | 2007-0336 | Severe weather in Eastern Kentucky; state of emergency applies to entire Commonwealth |
| **67.** 7/27/2007 | 2007-0610 | Failure of the Wolf Creek Dam |
| **68.** 10/4/2007 | 2007-0819 | Extreme drought conditions; also prohibited open burning |
| **69.** 10/23/2007 | 2007-0868 | Drought conditions in Kentucky |
| **70.** 2/6/2008 | 2008-0124 | Intense thunderstorms and tornadoes |
| **71.** 4/16/2008 | 2008-0332 | Strong thunderstorms across the Commonwealth |
| **72.** 6/27/2008 | 2008-0597 | Strong storms in Indiana; order to provide assistance |
| **73.** 7/7/2008 | 2008-0678 | Biohazard released in the federal prison in McCreary County |
| **74.** 8/29/2008 | 2008-0923 | To support Louisiana's preparation efforts for Hurricane Gustav |
| **75.** 9/10/2008 | 2008-0959 | To support Texas's preparation efforts for Hurricane Gustav |
| **76.** 9/10/2008 | 2008-0960 | To support Louisiana's preparation efforts for Hurricane Gustav |
| **77.** 9/15/2008 | 2008-0974 | Conditions in the Commonwealth resulting from Hurricane Ike |
| **78.** 10/10/2008 | 2008-1056 | Water emergency in Magoffin County |
| **79.** 11/12/2008 | 2008-1182 | Damage relief caused by drought |
| **80.** 1/27/2009 | 2009-0098 | Snow and ice storm across Kentucky |
| **81.** 2/20/2009 | 2009-0158 | State of emergency in Marshall County related to young men on a capsized boat that were not yet located |
| **82.** 5/11/2009 | 2009-0432 | Strong storms in Central and Eastern Kentucky |
| **83.** 8/11/2009 | 2009-0756 | Strong storms in North Central and Eastern parts of Kentucky |
| **84.** 12/21/2009 | 2009-1207 | Strong winter storms in Central and Eastern parts of Kentucky |
| **85.** 1/6/2010 | 2010-0026 | Water shortage in Perry County due to water line break |
| **86.** 5/3/2010 | 2010-0286 | Strong storms in Central and Eastern Kentucky |

| Date:* | Order Number: | Related to: |
| --- | --- | --- |
| **87.** 7/19/2010 | 2010-0621 | Flash flood in Pike and Shelby Counties |
| **88.** 7/21/2010 | 2010-0633 | Severe thunderstorms in Pike and Shelby Counties |
| **89.** 7/21/2010 | 2010-0634 | Severe thunderstorms in Carter, Fleming, Lewis and Rowan Counties |
| **90.** 11/4/2010 | 2010-0909 | Drought conditions |
| **91.** 4/25/2011 | 2011-0274 | Strong spring storms across the Commonwealth |
| **92.** 6/21/2011 | 2011-0474 | Strong storms in eastern Kentucky |
| **93.** 9/9/2011 | 2011-0711 | Drought; U.S. Sec. of Agriculture designated several areas in southwestern part of the U.S. as disaster areas |
| **94.** 2/6/2012 | 2012-0088 | Water loss in Harlan County |
| **95.** 2/24/2012 | 2012-0139 | Collapse of a ferry bridge in Trigg County |
| **96.** 3/3/2012 | 2012-0154 | Severe weather across the Commonwealth – tornadoes, hurricane force winds |
| **97.** 3/3/2012 | 2012-0156 | Emergency authority for pharmacists in certain counties (dispense 30-day emergency supply of medication, administer immunizations to children; dispense drugs as needed to respond to circumstances of emergency) |
| **98.** 3/5/2012 | 2012-0157 | Amended emergency order pertaining to severe weather |
| **99.** 3/5/2012 | 2012-0158 | Severe weather across the Commonwealth – commercial motor vehicles transporting relief supplies exempt from fees for overweight vehicles |
| **100.** 3/5/2012 | 2012-0159 | Added additional counties to list of emergency authority for pharmacists (see 2012-0156) |
| **101.** 3/6/2012 | 2012-0180 | " " |
| **102.** 3/7/2012 | 2012-0186 | " " |
| **103.** 3/8/2012 | 2012-0190 | " " |
| **104.** 3/14/2012 | 2012-0196 | Adjustment of insurance related rules and regulations on a temporary and short-term basis |
| **105.** 3/29/2012 | 2012-0234 | Authority for pharmacists – No additional counties have declared a state of emergency |
| **106.** 6/27/2012 | 2012-0486 | Drought conditions across the Commonwealth |
| **107.** 10/29/2012 | 2012-0889 | Hurricane Sandy; render mutual aid |
| **108.** 4/25/2013 | 2013-0264 | Strong storms across the Commonwealth |
| **109.** 2/17/2015 | 2015-0118 | Severe winter storm across the Commonwealth |

| Date:* | Order Number: | Related to: |
|---|---|---|
| **110.** 2/17/2015 | 2015-0120 | Emergency authority for pharmacists – severe winter storm |
| **111.** 2/24/2015 | 2015-0134 | Emergency authority for pharmacists – severe winter storm |
| **112.** 3/6/2015 | 2015-0151 | Severe winter storm across the Commonwealth |
| **113.** 3/6/2015 | 2015-0152 | Severe winter storm across the Commonwealth – commercial motor vehicles transporting relief supplies exempt from fees for overweight vehicles |
| **114.** 4/6/2015 | 2015-0224 | Severe storm fronts across the Commonwealth |
| **115.** 7/14/2015 | 2015-0473 | Severe storms across the Commonwealth |
| **116.** 7/14/2015 | 2015-0480 | Amended order pertaining to severe storms across the Commonwealth |
| **117.** 7/14/2015 | 2015-0481 | Second amended order pertaining to severe storms across the Commonwealth |
| **118.** 1/25/2016 | 2016-0034 | Severe winter storms across the Commonwealth |
| **119.** 7/8/2016 | 2016-0502 | Severe storms across the Commonwealth |
| **120.** 11/3/2016 | 2016-0792 | Drought conditions across the Commonwealth |
| **121.** 12/22/2016 | 2016-0917 | Montgomery County – extremely high levels of arsenic |
| **122.** 3/6/2017 | 2017-0138 | Severe storms across the Commonwealth |
| **123.** 2/26/2018 | 2018-0137 | Severe storms across the Commonwealth |
| **124.** 2/25/2019 | 2019-0164 | Severe storms across the Commonwealth |
| **125.** 3/4/2019 | 2019-0184 | Severe storms across the Commonwealth |
| **126.** 2/7/2020 | 2020-0136 | Heavy rain across the Commonwealth; flooding and landslides |
| **127.** 3/6/2020 | 2020-0215 | COVID-19 |

**Price gouging:**

| Date:* | Order Number: | Related to: |
|---|---|---|
| **1.** 8/31/2005 | 2005-0943 | Prohibition against price gouging (related to Hurricane Katrina) |
| **2.** 11/8/2005 | 2005-1235 | Prohibition against price gouging (related to extreme storms in Crittenden, Hart, Henderson and Webster Counties – but prohibition applies to entire state) |
| **3.** 9/12/2008 | 2008-0967 | Prohibition against price gouging (related to Hurricane Ike in Louisiana) |
| **4.** 1/28/2009 | 2009-0099 | Prohibition against price gouging (related to winter storms across the Commonwealth) |

| Date:* | Order Number: | Related to: |
|---|---|---|
| **5.** 5/13/2009 | 2009-0446 | Prohibition against price gouging (related to severe storms in several counties) |
| **6.** 12/21/2009 | 2009-1212 | Prohibition against price gouging (related to winter storms in several counties in Central and Eastern Kentucky) |
| **7.** 5/3/2010 | 2010-0287 | Prohibition against price gouging (related to severe storms across the Commonwealth) |
| **8.** 7/21/2010 | 2010-0633 | Prohibition against price gouging in Pike and Shelby Counties (related to severe storms) |
| **9.** 4/26/2011 | 2011-0279 | Prohibition against price gouging (related to severe storms across the Commonwealth) |
| **10.** 3/3/2012 | 2012-0155 | Prohibition against price gouging (related to severe storms across the Commonwealth) |
| **11.** 2/17/2015 | 2015-0119 | Prohibition against price gouging (related to severe storms across the Commonwealth) |
| **12.** 7/14/2015 | 2015-0482 | Prohibition against price gouging (related to severe storms across the Commonwealth) |
| **13.** 1/25/2016 | 2016-0035 | Prohibition against price gouging (related to severe winter storms across the Commonwealth) |
| **14.** 7/8/2016 | 2016-0505 | Prohibition against price gouging (related to severe storms across the Commonwealth) |
| **15.** 3/6/2017 | 2017-0139 | Prohibition against price gouging (related to severe storms across the Commonwealth) |
| **16.** 2/26/2018 | 2018-0138 | Prohibition against price gouging (related to severe storms across the Commonwealth) |
| **17.** 2/27/2019 | 2019-0166 | Prohibition against price gouging (related to severe storms across the Commonwealth) |
| **18.** 3/4/2019 | 2019-0184 | Prohibition against price gouging (related to severe storms across the Commonwealth) |

 * These are the dates the executive orders declaring a state of emergency were filed in the Executive Journal.  There can be variance between the date of entry and the date of the declaration of emergency, but at most the date varies by a few days.

**I.     COVID-19 legislation introduced in the 2020 Legislative Session**

Legislation passed and in effect:

| Bill | Description |
|---|---|
| 1.   **Senate Bill 150** | General COVID-19 relief bill.  See footnote 15 and accompanying text. |
| 2.   **Senate Bill 177** | Education bill that addresses issues facing school districts in relation to COVID-19 and allows school districts to use as many nontraditional instruction days as deemed necessary to curb the spread of the virus. |
| 3.   **House Bill 352** | Executive branch budget: references funding for the Kentucky Poison Control Center and COVID-19 hotline; the impact of COVID-19 on the status of dual credit scholarships; directs that no federal funds from the CARES act shall be used to establish any new programs unless those new programs can be fully supported from existing appropriations. |
| 4.   **House Bill 356** | Judicial branch budget: makes appropriations for the operations, maintenance and support of the Judicial Branch and which authorized the Chief Justice to declare a Judicial Emergency to protect the health and safety of court employees, elected officials and the general public during the COVID-19 emergency. |
| 5.   **House Bill 387** | Permits the Cabinet for Economic Development to make loans to rural hospitals to assist in providing health care services. |

Legislation that did not pass:

| Bill | Description |
|---|---|
| 6.   **Senate Bill 9** | Would have allowed the Attorney General to seek injunctive relief, as well as civil and criminal penalties, for violations of KRS 216B regarding abortion facilities and any orders issued under KRS Chapter 39A relating to elective medical procedures, including abortions. |
| 7.   **Senate Bill 136** | Would have allowed chiropractors and dentists to continue providing care.  It also would have allowed entities like the Kentucky Restaurant Association and the Kentucky Hospital Association, to issue guidance on reopening businesses consistent with guidance on avoiding the spread of COVID-19. |

| Bill | Description |
|---|---|
| 8. **House Bill 32** | Contained an amendment to create a Kentucky Small Business COVID-19 Task Force that would recommend reopening strategies, evaluate forms of assistance for small businesses, and develop recommendations for the General Assembly to consider related to small business assistance. |
| 9. **House Bill 322** | Sought to create a new section of KRS Chapter 39A to limit the scope of emergency orders issued by the Governor and create a civil cause of action for persons adversely affected by an emergency order. The amendment would also make public officials who violate the amendment guilty of a Class A misdemeanor. |
| 10. **House Bill 351** | Proposed an amendment to KRS 39A.100 to allow the Governor, upon recommendation of the Secretary of State, to declare by executive order a different time, place or manner for holding elections in an election area in which a state of emergency has been declared. |
| 11. **House Bill 424** | Included an amendment that would provide that the time requirement for any filing, notice, recording, or other legal act with the County Clerk would be tolled until thirty days after the declaration of emergency ends. |
| 12. **House Bill 449** | Included an amendment that would provide that the time requirement for any filing, notice, recording, or other legal act with the County Clerk would be tolled until thirty days after the declaration of emergency ends. |
| 13. **House Bill 451** | Included an amendment to prohibit abortion facilities or physicians from deeming an abortion to be an emergent medical procedure. |
| 14. **House Bill 461** | Contained amendments for educational relief, similar to Senate Bill 177. |

## II. Resolutions introduced: All adopted but Senate Joint Resolution 246

| Resolution | Description |
|---|---|
| 1. **Senate Joint Resolution 246** | Introduced on 03/06/2020 "directing the Cabinet for Health and Family Services to assess Kentucky's preparedness to address the coronavirus and report to the General Assembly." It was assigned to the Senate Health and Welfare Committee but received no hearing. |

| Resolution | Description |
| --- | --- |
| 2. **Senate Resolution 296** | Honors teachers, bus drivers, janitorial staff of schools and other individuals delivering meals to Kentucky's students while schools are closed due to the coronavirus pandemic. |
| 3. **Senate Resolution 321** | Honors Kentucky Mist Distillery for its help during the COVID-19 pandemic. |
| 4. **Senate Resolution 331** | Honors the Kentucky Beer Wholesalers Association for distributing hand sanitizer. |
| 5. **Senate Resolution 332** | Commends the Governor and others for their courageous service during the COVID-19 crisis. |
| 6. **House Resolution 135** | Encourages LRC to establish emergency preparedness task force. |
| 7. **House Resolution 137** | Honors the Beer Wholesalers. |